[Nos. 57416-7-I; 58021-3-I. Division One. September 17, 2007.]

JANE DOE ET AL., *Respondents*, v. THE CORPORATION OF THE PRESIDENT OF THE CHURCH OF JESUS CHRIST OF LATTER-DAY SAINTS ET AL., *Appellants*.

410

*Thomas D. Frey* and *Michael C. Bolasina* (of *Stafford Frey Cooper*); *Marcus B. Nash*; and *Charles C. Gordon* and *Jeffrey I. Tilden* (of *Gordon Tilden Thomas & Cordell, LLP*), for appellant Corporation of the President of the Church of Jesus Christ of Latter-Day Saints.

*Sean P. Wickens* (of *Armijo Wickens, PS*), for appellant Peter Taylor.

*Michael T. Pfau, Bradley A. Maxa, Michelle Menely*, and *Steven T. Reich* (of *Gordon Thomas Honeywell Malanca Peterson & Daheim, LLP*), for respondents.

*Stewart A. Estes* on behalf of Washington Defense Trial Lawyers, amicus curiae.

*Kelby D. Fletcher* and *Bryan P. Harnetiaux* on behalf of Washington State Trial Lawyers Association Foundation, amicus curiae.

¶1 APPELWICK, C.J. — Two sisters who had been sexually abused by their stepfather sought damages from the Corporation of the President of the Church of Jesus Christ of Latter-Day Saints (LDS Church) for negligence and intentional infliction of emotional distress. They also sought damages against their stepfather for intentional infliction of emotional distress. A jury found the LDS Church liable both for the failure of a bishop to report the abuse of the older sister and for the subsequent abuse of the younger sister. The jury also found the LDS Church liable for intentional infliction of emotional distress, due to intimidating statements made by the bishop to the victim. Lastly, the jury found the stepfather liable for intentional infliction of emotional distress. The trial court entered a judgment against the stepfather and the church, holding them jointly and severally liable. LDS Church appeals the verdict. The victims cross-appeal the issue of whether the church owed them a common law duty to protect them.

¶2 We affirm the jury verdict for the tort of outrage against the LDS Church but vacate the determination of joint and several liability with the stepfather. We affirm that the LDS Church did not owe a common law duty to protect the plaintiffs. We reverse the jury verdict of negligence against the LDS Church, concluding that the bishop was not a social service counselor as defined by the mandated reporting statute and therefore did not have a duty to report the abuse. We remand to the trial court for entry of a judgment consistent with this opinion.

## FACTS

¶3 Peter Taylor[1] was accused of and pleaded guilty to sexually abusing his stepdaughters. Taylor; his former wife, Dianne Osborne; and her two daughters were members of the LDS Church during all relevant times. Taylor was a high priest, which is a position of leadership attained by most adult males actively involved in the LDS Church. He abused Jessica Cavalieri from 1988 to 1995. He abused her younger sister, Ashley Cavalieri, from 1992 to 1998.[2]

¶4 Members of the LDS Church who are experiencing problems are instructed to "make a diligent effort, including earnest prayer and scripture study, to find solutions and answers themselves. If they still need help, they should counsel first with their bishop." Bishops counsel ward and stake members who seek "spiritual guidance, who have weighty personal problems or . . . serious transgressions."[3]

¶5 Bruce Randall Hatch served as an ordained LDS bishop from 1990 until 1996.[4] At the same time, he maintained a regular full-time job as an engineer. Bishop Hatch received training and education by the LDS Church on the

---

[1] We note that the complaint was filed naming one defendant as John Roe; however, throughout this opinion and for consistency we will refer to him by his name as his identity was revealed.

[2] We note that the complaint was filed naming the plaintiffs as Jane and Rebecca Doe; however, because their identity was revealed and used in their own briefing and at the time of this appeal neither is under age 18, we will refer to them throughout this opinion by their names.

[3] A "ward" is an LDS Church congregation with 300-600 members within a geographic boundary. There is a bishop for each ward who has ecclesiastical authority over the members. A "stake" consists of a number of wards within certain geographic boundaries and the stake president has ecclesiastical authority over the wards. *Scott v. Hammock*, 870 P.2d 947, 949 n.1 (Utah 1994).

[4] Even at the higher levels, the LDS Church has a lay clergy. As the Utah Supreme Court has explained:

A bishop's and stake president's duties include giving spiritual guidance and counsel to the members of the Church in their jurisdiction. They receive no formal educational training as clergymen, are not compensated by the Church, and perform their ecclesiastical duties in addition to their vocations.

*Id.*

topic of child sexual abuse and attended training sessions two to three times a year. Bishop Hatch had also worked extensively with church youth and was a scoutmaster. However, he had never received professional training in the fields of psychology, psychotherapy or counseling, or techniques for questioning children about abuse.

¶6 According to Jessica, sometime in 1995 she met with Bishop Hatch and told him her stepfather was sexually abusing her. Jessica testified that she told her friend Cherisse Anderson that "[Taylor] was coming into [her] room at night, and abusing [her]." Cherisse encouraged her to speak to their bishop. Jessica stated that she went to Bishop Hatch because she "just wanted the abuse to stop. That's it." Jessica testified that Bishop Hatch referred to a conversation with Cherisse in which Cherisse had suggested that Taylor had been touching Jessica inappropriately. Jessica testified that after some "back and forth," she told Bishop Hatch that her stepfather "touched me on my private parts in the middle of the night, in my bed, and it did make me uncomfortable."

¶7 According to Jessica, Bishop Hatch responded, "I'm so glad you came and talked to me, because I don't have to report it." Jessica said that Bishop Hatch then talked about another family in the ward. She testified that he told her "that one of the twin daughters had gone to the school counselor, and told the school counselor that her dad was abusing her, and the school counselor reported it to Child [Protective Services]. And [then] he said that, Child [Protective Services] went into the house, the family is losing everything, they are going bankrupt, and everybody in the ward is gossiping about them." When asked at trial, Jessica replied that she knew about the Roberts family at the time "because there were people talking about it." She stated that

[the] message came across pretty loud and clear when he said, "I'm so glad you came to me and not to a school counselor, or not to a teacher," and so on and so forth, meaning that he wouldn't have to report it. But, had I gone to somebody else, they would

have reported it. And the situation, what happened to the Roberts family, would be what would happen to my family.

When asked how that made her feel, she replied,

> partially relieved that I didn't go to somebody else who would report it, because again, I didn't want to be the breakup—the cause of the breakup of the family. I felt, you know, that I could never live that down.
>
> And then part of me was kind of scared, because thinking of what if, what if I had gone to somebody, and, you know, who knows what could happen now?
>
> If something like that happens, because somebody's abusing you, I mean, everybody loses. It's not just the perpetrator.

After her conversation with Bishop Hatch, Jessica went into the hallway while the bishop spoke with her mother and Taylor.[5] She thought Bishop Hatch was telling them about the abuse. After that meeting, Taylor's nightly molestations stopped. Instead he did things that Jessica considered "sexual harassment" rather than sexual abuse. Jessica testified that she thought her mother knew about the abuse and ongoing harassment but did not do anything to stop it.

¶8 Later, Jessica explained that "[t]elling Bishop Hatch was the first—he was the first person I was telling who had, I felt, power and authority to do something about [the abuse]. Jada [Eering] couldn't do anything about it. Cherisse couldn't do anything about it. But Bishop Hatch had the opportunity, the power, and authority, I felt to do something."

¶9 While Jessica testified that she thought that Bishop Hatch's purpose in calling her mother and Taylor into his office was to tell them about the abuse, Dianne Osborne testified that Bishop Hatch did not mention any abuse. Instead, he asked her about morning and evening family prayer, and how the family was doing in general.

---

[5] Bishop Hatch disputed Taylor's presence at the conference. Jessica testified that Taylor did attend the meeting.

¶10 Bishop Hatch's account of his conversation with Jessica differs considerably. According to his testimony, Jessica's friend Cherisse approached him and reported that Jessica had said that Taylor was coming into Jessica's room and improperly touching her. Bishop Hatch testified that Jessica's mother called him to set up an appointment. He stated that during the appointment he asked, "What's the problem?" and Jessica replied, "[Taylor] has been coming into my room, and I want him to stay out of it." After a few more words regarding Jessica's wish to keep Taylor out of her room, Bishop Hatch asked Jessica's mother to excuse them. He testified that he asked Jessica "did he fondle you? Did he try to kiss you? What did he do? And she said, No. He didn't—he didn't touch me. He didn't do any of that." Bishop Hatch's testimony continues with his explanation that he "talked with her quite at length about it's never the fault of a young person, if an adult, using his authority, tries to do something that's improper, that you don't have to tolerate it, and that you should tell somebody immediately about it, and not to feel guilty." He then repeated his questioning about Taylor touching her, and she again denied it. He testified that he asked if Taylor ever "talk[ed] dirty" to her, or tried to watch her while she dressed or bathed, and she answered, "as far as I know, no." Bishop Hatch stated that he told Jessica that she had a number of alternatives—she could talk to her mother, her grandparents, her church leaders, or her school counselor if Taylor ever attempted to do any of the things he had asked about. Finally, Bishop Hatch testified that he suggested to both Jessica and her mother that they put a lock on Jessica's door.

¶11 Throughout his testimony, Bishop Hatch maintained that while he knew that Taylor's presence in Jessica's room made her "very nervous," Jessica's denial of abuse led him to believe that Taylor had not actually touched or abused her. As such, Bishop Hatch felt that he could not tell Dianne Osborne that Jessica was being abused. He could, however, alert Dianne Osborne to warn Taylor that if Taylor was considering doing anything that was inappropriate,

Bishop Hatch would have to report it to CPS (Child Protective Services). He denies ever mentioning CPS to Jessica. Bishop Hatch also testified that Dianne's response to his offer to consult with higher church authorities left him with the impression that he should stay "out of the loop" and that she would handle it herself.

¶12 In 1998, in an e-mail conversation with a friend, Jessica disclosed that her stepfather had sexually abused her for a number of years. The friend notified the new bishop of their LDS Church ward, Bishop Wade. After being told that Bishop Wade had been informed of the abuse, Jessica met with him. She begged him not to report the allegations; he insisted that he had to. According to Jessica's testimony, she said, "But Bishop Hatch said he didn't have to report it." She stated that Bishop Wade replied, "Well, he didn't handle it the right way." She also said that he encouraged her to tell her mother so that Taylor would move out of the family home. Bishop Wade indicated that it would be better if Taylor was not in the house when CPS came. Bishop Wade then confronted Taylor about the abuse, and Taylor confessed to Wade. *See Jane Doe v. Corp. of President of Church of Jesus Christ of Latter-Day Saints*, 122 Wn. App. 556, 90 P.3d 1147 (2004), *review denied*, 153 Wn.2d 1025 (2005) (related case finding that Taylor confessed the abuse to Wade).

¶13 Taylor admitted the abuse to his spouse, Dianne Osborne. Dianne verified the abuse with Jessica. Taylor then left the family home. Bishop Wade also reported the alleged abuse to the stake president, Richard Mitchell. After a church disciplinary proceeding in January 1999, the LDS Church decided that the appropriate discipline for Taylor was disfellowshipment. *See id.* Apparently, Bishop Wade did not report the abuse to CPS and nobody from the LDS Church reported Jessica's allegations to the civil authorities.

¶14 In January 2000, Dianne Osborne learned that Taylor had sexually abused her younger daughter, Ashley. Dianne called CPS to report the abuse. Upon placing that

call, she learned that Jessica's abuse had never been reported by the LDS Church. Taylor was criminally charged and prosecuted for the sexual abuse of both Jessica and Ashley. Taylor pleaded guilty to child molestation in the first degree and was sentenced to prison.

¶15 In February 2002, Jessica and Ashley's guardian ad litem, Michael Osborne, filed a tort lawsuit against Taylor and the LDS Church for negligence, breach of fiduciary duty, and intentional infliction of emotional distress. The complaint alleges that the LDS Church bishops and other church officials "breached both a statutorily proscribed [sic] duty and a duty of reasonable care by failing to report" Taylor's sexual abuse of Jessica. The LDS Church answered and denied the allegations against it.

¶16 The LDS Church moved for a directed verdict "to dismiss any claims arising or connected to the reporting statute for lack of evidence that the bishops were acting in any capacity other than as a bishop under the *Motherwell*[6] decision. Plus, there's no evidence that they were social service counselors, as defined by statute." This motion was denied by the trial court.

¶17 The LDS Church then sought summary judgment on the plaintiffs' negligence claim, arguing again that Bishop Hatch did not meet the statutory definition of social service counselor and therefore did not have a duty to report. This was also denied by the trial court, which "believe[d] that whether or not these people were acting as clergy or as social workers pursuant to the terms and definitions of the statutes is a question of fact for the jury." The LDS Church sought discretionary review of the trial court's order compelling the church to produce confidential church disciplinary records regarding Taylor. This was resolved in the church's favor. *Jane Doe*, 122 Wn. App. 556.

¶18 At the close of plaintiffs' case, the trial court granted the LDS Church's motion to dismiss the negligence claim

---

[6] *State v. Motherwell*, 114 Wn.2d 353, 788 P.2d 1066 (1990) (holding that one of the defendants was exempt from the mandated reporting requirement because of his status as an ordained minister acting in a religious context).

based on breach of a special relationship. After three weeks of trial, the jury returned a verdict in the plaintiffs' favor. Jessica's total damages were $3,180,000, with $1.2 million against Taylor for the tort of outrage based on his sexual abuse, $1.1 million against the LDS Church for the tort of outrage, and $880,000 against the LDS Church for negligence arising out of Bishop Hatch's failure to report the abuse under RCW 26.44.030. Ashley's total damages were $1,052,000, with $530,000 against Taylor for the tort of outrage based on his sexual abuse, and $522,000 against the LDS Church for negligence arising out of Bishop Hatch's failure to report the abuse under RCW 26.44.030.

¶19 Over the LDS Church's timely objections, the trial court entered judgment against both defendants jointly and severally. On February 9, 2006, LDS Church filed posttrial motions for judgment as a matter of law and/or for a new trial and/or for remittitur. These motions were denied. The LDS Church filed for appeal on February 28 and a supplemental notice of appeal seeking review of the trial court's order denying its posttrial motions. The plaintiffs filed a cross-appeal on April 7, 2006, seeking review of the trial court's dismissal of their negligence claim based on breach of a special relationship.

## ANALYSIS

### I. *Mandated Reporting Statute*

#### A. *Private Cause of Action*

¶20 While the LDS Church focuses on statutory interpretation, a threshold issue involves whether Osborne can seek a private remedy under a statute that imposes criminal penalties. The LDS Church argues in its opening brief that the mandated reporting statute does not create a *private* right of action for Jessica to sue Bishop Hatch because it imposes *criminal* misdemeanor penalties on mandatory reporters if they fail to report child abuse. RCW 26.44.030(1)(a). However, Osborne notes that "[i]t has long

been recognized that a legislative enactment may be the foundation of a right of action." *Tyner v. Dep't of Soc. & Health Servs.*, 141 Wn.2d 68, 77, 1 P.3d 1148 (2000).

¶21 The *Tyner* court refers to the questions required in determining whether a cause of action will be implied from a statute: " '[F]irst, whether the plaintiff is within the class for whose "especial" benefit the statute was enacted; second, whether legislative intent, explicitly or implicitly supports creating or denying a remedy; and third, whether implying a remedy is consistent with the underlying purpose of the legislation.' " *Id.* at 77-78 (alteration in original) (quoting *Bennett v. Hardy*, 113 Wn.2d 912, 920-21, 784 P.2d 1258 (1990)). There is no question that Jessica and her sister are within the class of persons that the mandated reporting statute is designed to protect. *See, e.g., C.J.C. v. Corp. of Catholic Bishop*, 138 Wn.2d 699, 727, 985 P.2d 262 (1999); *Tyner*, 141 Wn.2d at 79. Further, the *Tyner* court held that a private cause of action was implied in RCW 26.44.050 when a parent sued CPS for negligent investigation of reports of child abuse. *Tyner*, 141 Wn.2d at 80 (stating that the "[l]egislature intends a remedy for both the parent and the child if that interest is invaded"). If the legislature intended a remedy for parent victims of negligent child abuse investigations, it is reasonable to imply an intended remedy for child victims of sexual abuse when those required to report the abuse fail to do so. Finally, implying a remedy is consistent with the underlying intent of the statute—imposing civil consequences for failure to report motivates mandatory reporters to take action to protect victims of childhood sexual abuse.

¶22 Moreover, another section of chapter 26.44 RCW grants immunity from civil liability to "[a] person who, in good faith and without gross negligence, cooperates in an investigation arising as a result of a report made pursuant to this chapter." RCW 26.44.060(5). However, "[t]his subsection does not apply to a person who caused or allowed the child abuse or neglect to occur." RCW 26.44.060(5). A grant of immunity from liability clearly implies that civil

liability can exist in the first place. Accordingly, we conclude that a private cause of action is implied under the mandated reporting statute.

B. *Negligence for Failure To Report*

¶23 The mandated reporting statute provides:

> When any practitioner, county coroner or medical examiner, law enforcement officer, professional school personnel, registered or licensed nurse, *social service counselor*, psychologist, pharmacist, licensed or certified child care providers or their employees, employee of the department, juvenile probation officer, placement and liaison specialist, responsible living skills program staff, HOPE center staff, or state family and children's ombudsman or any volunteer in the ombudsman's office has reasonable cause to believe that a child has suffered abuse or neglect, he or she shall report such incident, or cause a report to be made, to the proper law enforcement agency or to the department as provided in RCW 26.44.040.

RCW 26.44.030(1)(a) (emphasis added).

¶24 "Social services counselor" is defined as

> anyone engaged in a professional capacity during the regular course of employment in encouraging or promoting the health, welfare, support or education of children, or providing social services to adults or families, including mental health, drug and alcohol treatment, and domestic violence programs, whether in an individual capacity, or as an employee or agent of any public or private organization or institution.

RCW 26.44.020(8).

¶25 The LDS Church argues that the mandated reporting statute does not impose a general duty to report child abuse but only requires certain categories of professionals to report child abuse. Because Bishop Hatch is not a *professional* social service counselor, the LDS Church contends that he had no duty to report. Osborne counters that the statute consists of two independent clauses, so the professional status requirement applies only to the professions specifically listed, not to people providing social ser-

vices to adults or families generally. The trial court agreed with Osborne's interpretation of the statue. Accordingly, the trial court determined that whether (1) Bishop Hatch was providing social services and (2) whether Bishop Hatch was acting in the capacity of a clergyman were both questions for the jury. The first question for review is whether the trial court correctly interpreted the definition of "social service counselor" under RCW 26.44.020(8).

### C. *Interpretation of "Social Service Counselor"*

¶26 This court reviews the trial court's interpretation of a statute de novo. *Stroh Brewery Co. v. Dep't of Revenue*, 104 Wn. App. 235, 239-40, 15 P.3d 692 (2001). "When statutory language is clear, we assume that the legislature 'meant exactly what it said' and apply the plain language of the statute." *Id.* (quoting *Duke v. Boyd*, 133 Wn.2d 80, 87, 942 P.2d 351 (1997)). If statutory language is ambiguous, the statute must be construed so as to effectuate the legislative intent. *Wingert v. Yellow Freight Sys., Inc.*, 146 Wn.2d 841, 852, 50 P.3d 256 (2002). "A statute is ambiguous if it is susceptible to two or more reasonable interpretations." *Stroh Brewery*, 104 Wn. App. at 239.

¶27 Osborne suggests that there are two differing interpretations of the definition of "social service counselor," i.e., that it is not immediately clear to whom the clause "engaged in a professional capacity during the regular course of employment" applies. RCW 26.44.020(8). Osborne's interpretation, as accepted by the trial court, suggests two different clauses, such that "professional capacity" applies only to the first category:

> "Social service counselor" means anyone [(a)] engaged in a professional capacity during the regular course of employment in encouraging or promoting the health, welfare, support or education of children, or [(b)] providing social services to adults or families, including mental health, drug and alcohol treatment, and domestic violence programs, whether in an individual capacity, or as an employee or agent of any public or private organization or institution.

RCW 26.44.020(8).

¶28 Osborne maintains that the strong legislative policy of protecting child abuse victims supports a broad interpretation of the statute:

The Washington state legislature finds and declares: The bond between a child and his or her parent, custodian, or guardian is of paramount importance, and any intervention into the life of a child is also an intervention into the life of the parent, custodian, or guardian; however, instances of nonaccidental injury, neglect, death, *sexual abuse* and cruelty to children by their parents, custodians or guardians have occurred, and in the instance where a child is deprived of his or her right to conditions of minimal nurture, health, and safety, the state is justified in emergency intervention based upon verified information; *and therefore the Washington state legislature hereby provides for the reporting of such cases to the appropriate public authorities*. It is the intent of the legislature that, as a result of such reports, protective services shall be made available in an effort to prevent further abuses, and to safeguard the general welfare of such children.

RCW 26.44.010 (emphasis added).

¶29 The Washington State Supreme Court has also explained the purpose of the mandatory reporting statute: "[T]he [l]egislature has made clear that the prevention of child abuse is of 'the highest priority, and all instances of child abuse must be reported to the proper authorities who should diligently and expeditiously take appropriate action.'" *C.J.C.*, 138 Wn.2d at 727 (quoting Laws of 1985, ch. 259, § 1 (legislative findings appended to RCW 26.44.030)).

¶30 The LDS Church relies on *C.J.C.* to support its argument that the mandated reporting statute applies only to professionals. First, the plain language of the statute itself does not state that *every* person *must* report any and all instances of child abuse. Further, the LDS Church points to language in *C.J.C.* in which the Supreme Court wrote that the mandated reporting statute "makes it a criminal offense for *certain professionals* to fail to notify the proper authorities when there is reason to suspect child-

hood sexual abuse." *Id.* at 726 (emphasis added). Although the penalty applies to those subject to the mandated reporting requirement, which includes certain professionals, the question here is whether *only* professionals are subject to the statute. The Supreme Court was not faced with this question in *C.J.C.* As such, its statements regarding the mandated reporting statute were incidental to the issues presented there. We hesitate to conclude that *C.J.C.* is dispositive of any of the parties' arguments.

¶31 Osborne makes a strong case for a broad interpretation of the statute. But the LDS Church points out that Osborne's interpretation would apply the statute to *anyone* providing social services to adults or families, *even when not engaged in a professional capacity or in the course of regular employment.* This would amount to a general duty on any individual providing social services, professionally or not, to report child abuse or be subject to criminal misdemeanor charges. The legislature did *not* frame the statute this way, i.e., it did not use the language "any person who provides social services," and leave it at that. Instead, the LDS Church argues that by listing certain types of professionals as mandated reporters and including the term "professional" in the definition of "social service counselor," the legislature intended that only those with professional training in social services would be mandated reporters. We agree.

¶32 First, we note that the majority of the listed mandated reporters are professionals that require licensing by the state or are government employees:

> practitioner, county coroner or medical examiner, law enforcement officer, professional school personnel, registered or licensed nurse, social service counselor, psychologist, pharmacist, licensed or certified child care providers or their employees, employee of the department, juvenile probation officer, placement and liaison specialist, responsible living skills program staff, HOPE center staff, or state family and children's ombudsman or any volunteer in the ombudsman's office.

RCW 26.44.030. A survey of statutory definitions of those listed also suggests that one is not a mandated reporter unless one is acting as a professional:

> "Practitioner of the healing arts" or "practitioner" means a person licensed by this state to practice podiatric medicine and surgery, optometry, chiropractic, nursing, dentistry, osteopathic medicine and surgery, or medicine and surgery or to provide other health services. The term "practitioner" includes a duly accredited Christian Science practitioner . . . .
>
> . . . .
>
> "Professional school personnel" include, but are not limited to, teachers, counselors, administrators, child care facility personnel, and school nurses.
>
> . . . .
>
> "Psychologist" means any person licensed to practice psychology under chapter 18.83 RCW, whether acting in an individual capacity or as an employee or agent of any public or private organization or institution.
>
> "Pharmacist" means any registered pharmacist under chapter 18.64 RCW, whether acting in an individual capacity or as an employee or agent of any public or private organization or institution.

RCW 26.44.020(3), (7), (9), (10).

¶33 In addition, in recent amendments addressing the Department of Corrections' duties, we note that the legislature explicitly intended to take "an important step toward improving the protection of . . . vulnerable populations [by] including certain department of corrections personnel among the *professionals* who are mandated to report suspected abuse or neglect of children." LAWS OF 1996, ch. 278, § 1 (emphasis added). However, the legislature was careful to note that it intended "to limit the circumstances under which department of corrections personnel are mandated reporters of suspected abuse or neglect to *only those circumstances when the information is obtained during the course of their employment*." LAWS OF 1996, ch. 278, § 1 (emphasis added).

¶34 Finally, in addition to using narrow language to define mandated reporters, the legislature explicitly included a reference to nonprofessionals, or "volunteers." This only occurs once in the list of mandated reporters—"any volunteer in the ombudsman's office." This implies other volunteers are not included. Implying "nonprofessional" or "volunteer" into the definition of social service counselor would be incongruous with this explicit reference. If the legislature intended nonprofessional social service counselors to be included, it knew how to expressly name them in the definition of social service counselor.

¶35 We conclude that the distinction between professional capacity and volunteer capacity is intentional and important. The statutory duty to report arises only in the actual regular course of employment or if volunteering in the ombudsman's office. The legislature did not intend the mandated reporting statute to apply to volunteer counselors who are not professional social service counselors and not acting in their regular course of employment.

¶36 According to the record before us, Bishop Hatch is not a trained professional social service counselor, he is not paid for his counseling services, and the counseling he provided to Jessica was not in the regular course of his employment. Bishop Hatch was not a professional social service counselor and was not mandated to report child abuse. We vacate the jury finding of negligence for failure to report pursuant to the statute and the judgment based upon that finding.

### D. State v. Motherwell: *Clergy Exemption*

¶37 LDS Church argues that Bishop Hatch meets the clergy exemption as established by *Motherwell*, 114 Wn.2d 353. In *Motherwell*, it was undisputed that the defendant was a social worker as defined by the mandatory reporting statute at the time. *Id.* at 358. There, the court conducted its analysis to determine (a) that the legislature intended to exempt clergy members from mandated reporting require-

ments when it removed them from the list of mandated reporters and that (b) the defendant, although a social worker, was exempt from reporting because he was a member of the clergy counseling his parishioner in a religious context. *Id.* at 360. Here, Bishop Hatch is not a social service counselor as defined by the statute, so he is not subject to the mandated reporting requirement. We need not conduct a *Motherwell* analysis.

II. *Outrage/Intentional Infliction of Emotional Distress*

¶38 LDS Church argues that as a matter of law, the jury's award of $1.1 million against the church on Jessica's common law outrage claim should be overturned. It argues that the trial court erred when it denied LDS Church's motion at the close of the plaintiffs' case to dismiss the claim. This motion is, in substance, a motion for a directed verdict under CR 50(a)(1).

¶39 When ruling on a motion for dismissal at the conclusion of plaintiffs' evidence, the court is required to consider all facts and inferences in a light most favorable to the plaintiff. *Jackson v. Peoples Fed. Credit Union*, 25 Wn. App. 81, 82-83, 604 P.2d 1025 (1979). Specifically, in deciding whether the question of outrage should go to the jury, the trial court's role is to make an initial determination as to whether the conduct may reasonably be regarded as so "extreme and outrageous" as to warrant a factual determination by the jury. *Id.* at 84 (citing RESTATEMENT (SECOND) OF TORTS § 46 cmt. h). "It is only where the evidence is such that reasonable minds cannot differ that the trial court is justified in granting defendant's motion to dismiss." *Id.* at 82-83. In determining this, a trial court considers

(a) the position the defendants occupied; (b) whether the plaintiff was peculiarly susceptible to emotional distress, and if the defendants knew this fact; (c) whether the defendants' conduct may have been privileged under the circumstances; (d) whether the degree of emotional distress the defendants caused was severe as opposed to merely annoying, inconvenient, or embarrassing to a degree normally occurring in a

confrontation between these parties; and (e) whether the defendants were aware that there was a high probability that their conduct would cause severe emotional distress, and they consciously disregarded it.

*Seaman v. Karr*, 114 Wn. App. 665, 685, 59 P.3d 701 (2002) (citing *Phillips v. Hardwick*, 29 Wn. App. 382, 388, 628 P.2d 506 (1981)).

¶40 Jessica presented the following evidence to sustain her claim of outrage, from which she is entitled to all inferences drawn in her favor: First, Bishop Hatch was in a leadership position in the LDS Church. Jessica was a teenage member of the LDS Church. The church instructed its members to seek advice and counsel from their bishops. Bishop Hatch was in a position of authority relative to her as a church member.[7]

¶41 Jessica testified that when she was 9 or 10 years old, the first person to whom she confided about the sexual abuse was her friend, Jada Eering. Jada helped Jessica write a letter to Taylor, "basically asking him to stop." That letter was never acknowledged by Taylor. It was not until she was 13 or 14 that Jessica turned to another teenage friend, not an adult, and confided in her that she was still being sexually abused by Taylor. That friend, also a member of the LDS Church, suggested she go to her bishop because "[h]e can fix it." Jessica replied that she was "scared," so her friend offered to make an appointment for Jessica to meet with Bishop Hatch and did so.

¶42 Jessica remembered being nervous about the meeting. She testified that she told Bishop Hatch that she was suffering sexual abuse at the hands of Taylor. Right after the meeting, when she thought that Bishop Hatch was confronting Taylor and her mother, she was "nervous," and hopeful "for the abuse stopping, and I guess for me to be free."

---

[7] We are not presented with argument or authority to establish that the communications between the bishop and Jessica about the sexual abuse were privileged relative to this cause of action.

¶43 Further, Bishop Hatch himself testified that he had extensive experience in understanding youth, both from raising seven of his own children, including two daughters, and in his work as a bishop with the LDS Church. While he testified that he had not been specifically trained in how to question victims of child sexual abuse, he also testified that he had received training and education by the LDS Church on the topic of child sexual abuse and attended training sessions two to three times a year.[8] He said that he could tell Jessica was nervous about Taylor's presence in her room at night. The jury could readily infer that Bishop Hatch knew or should have known that Jessica, or any young girl in Jessica's position, would have been peculiarly susceptible to emotional distress.

¶44 Further, Jessica presented evidence that Bishop Hatch suggested that if the abuse were to be reported to CPS, *she*, rather than the abuser, would be the cause of her family's breakup and would be at the center of church gossip. Bishop Hatch admitted that he discussed the possibility of a separation of the family if CPS got involved, and also "mentioned to [Jessica's mother] at that time that any case of child abuse, a person is in jeopardy of losing their membership in the Church." According to Jessica's mother, he did not tell her that Jessica had told him that she was being sexually abused.

¶45 While Bishop Hatch testified that he suggested placing a lock on Jessica's bedroom door and that he told Jessica that she had many people to whom she could turn, he did not report the sexual abuse to LDS Church Social Services,

---

[8] A booklet entitled "Child Abuse, Helps for Ecclesiastical Leaders" refers to the possibility that mandated reporting laws may require disclosure:

Laws in most states in the United States . . . require citizens to report suspected child abuse in order to protect children and help offenders, victims and family members obtain needed assistance. Learn the reporting requirements for your area. LDS Social Services agencies can provide general information about local reporting requirements. . . .

When any information regarding child abuse comes to you or another Church officer from other than the confidential confession of the offender (probably from a victim or a victim's parents), local law *may* require it be reported to civil authorities.

his LDS Church superiors, or CPS. And, his advice had the effect of silencing Jessica:

> [the] message came across pretty loud and clear when he [Bishop Hatch] said, "I'm so glad you came to me and not to a school counselor, or not to a teacher," and so on and so forth, meaning that he wouldn't have to report it. But, had I gone to somebody else, they would have reported it. And the situation, what happened to the Roberts family, would be what would happen to my family.

When asked how his comments made her feel, Jessica replied:

> partially relieved that I didn't go to somebody else who would report it, because again, I didn't want to be the breakup—the cause of the breakup of the family. I felt, you know, that I could never live that down.
>
> And then part of me was kind of scared, because thinking of what if, what if I had gone to somebody, and, you know, who knows what could happen now?
>
> If something like that happens, because somebody's abusing you, I mean, everybody loses. It's not just the perpetrator.

Such advice left Jessica to hope that her mother would permit her to have a lock on her bedroom door and that it would keep her stepfather from abusing her. It also left her believing that if she sought more help, she might split up the family. She did not disclose the abuse until four to five years after her conversation with Bishop Hatch. The jury could readily conclude that Bishop Hatch's advice caused emotional distress that was more than mere annoyance or embarrassment arising from their face to face confrontation, and, in fact, prevented her from seeking further help in stopping the abuse.

¶46 Jessica testified to her emotional harm and supported her claim with expert testimony which if believed by the jury would support a conclusion of severe

emotional distress.[9] For all of Bishop Hatch's training and experience, the jury could also conclude that Bishop Hatch should have been aware of the probability of harm to Jessica from such advice as he gave and that he consciously disregarded that risk.

¶47 Noting the evidence, the trial court found that reasonable minds *could* differ on the question of outrage and denied the LDS Church's motion to dismiss the claim, stating:

> As to your motion to dismiss the cause of action for outrage, I believe, sir, that if the jury finds that [Jessica]'s testimony concerning what Bishop Hatch told her is accurate and correct—and I don't know what the jury's going to find. That's for the trier of fact to find . . . but if they find that Bishop Hatch, in fact, told her that, he basically discouraged her from pursuing anything further because the family would break up, they'd be out on the streets, basically, everybody would be talking about her, if that's true, then it seems to me that there's plenty of room for a jury to find outrage, and that would be the basis of the outrage.
>
> This is a 13- or 14-year old girl. This is sexual abuse. Someone who gets the courage up to go talk to an adult, a male adult at that, I believe that there's plenty of evidence there for a jury to find that the tort of outrage was indeed committed if they believe that occurred. And again, that's for them to decide.

¶48 We agree with the trial court. The evidence clearly did not compel taking the question of the tort of outrage away from the jury. The trial court did not err when it denied LDS Church's motion to dismiss the claim on the tort of outrage.

III. *Taylor Appeal: Prior Bad Acts Testimony*

¶49 Taylor argues that the trial court erred when it admitted testimony from his biological daughter, Julianne

---

[9] A psychologist testified that Jessica suffered from depression, anxiety, and behavioral problems. The psychologist stated that "she feels incredibly alone, sad and angry, very anxious, untrusting." When asked whether Jessica suffered a mental disorder, the psychologist stated that while she is not clinically psychopathological, the level of distress, worry, and anxiety she feels results in a moderately severe mental disorder.

Taylor, under the common scheme or plan exception to ER 404(b). Julianne testified that Taylor sexually abused her in a manner similar to his abuse of his stepdaughters. Taylor maintains that the trial court, in explaining its decision to admit her testimony, failed to conduct a four-part analysis established by the Washington Supreme Court in *State v. DeVincentis*, 150 Wn.2d 11, 74 P.3d 119 (2003). He asserts that the failure to conduct this analysis results in reversible error.

¶50 Evidence Rule 404(b) provides: "Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." However, crimes or misconduct other than the acts charged may be admitted for a variety of other reasons, including the proving of a scheme or plan of which the offense charged is a manifestation. *State v. Lough*, 125 Wn.2d 847, 853-54, 889 P.2d 487 (1995). "[A]dmission of evidence of a common scheme or plan requires substantial similarity between the prior bad acts and the charged crime. Such evidence is relevant when the existence of the crime is at issue. Sufficient similarity is reached only when the trial court determines that the 'various acts are naturally to be explained as caused by a general plan.' " *DeVincentis*, 150 Wn.2d at 21 (quoting *Lough*, 125 Wn.2d at 860); *see also State v. Foxhoven*, 161 Wn.2d 168, 163 P.3d 786 (2007). Further, a trial court must conduct a four-part analysis set forth by the *Lough* court: it must determine whether "the prior acts were (1) proved by a preponderance of the evidence, (2) offered for the purpose of proving a common plan or scheme, (3) relevant to prove an element of the crime charged or to rebut a defense, and (4) more probative than prejudicial." *DeVincentis*, 150 Wn.2d at 22 (citing *Lough*, 125 Wn.2d at 853). A trial court's decision to admit or exclude prior bad acts evidence is reviewed for abuse of discretion. *Lough*, 125 Wn.2d at 864-65. Judicial

discretion is not abused unless the reviewing court determines that no reasonable person would take the same view adopted by the trial court. *State v. Huelett*, 92 Wn.2d 967, 969, 603 P.2d 1258 (1979).

¶51 Here, the trial court's oral ruling specifically refers to *DeVincentis* in its articulation of balancing the probative value of Julianne's testimony against its prejudicial effect. But unlike the *DeVincentis* record, the trial court here did not give explicit reasoning regarding the first three factors of the *Lough* test. Taylor contends that this is reversible error. However, a review of the record shows that the trial court received briefing and argument on each element of the analysis and required the necessary elements from the parties.

¶52 First, in terms of proving the prior acts by a preponderance of the evidence, the trial court required the LDS Church to make an offer of proof regarding Julianne's abuse. This was corroborated by a police report from a 2000 investigation into Taylor's abuse, containing statements by Julianne. In addition, Julianne testified that when she was about 9 years old, her father kissed her inappropriately, groped her, and lay on top of her while masturbating.

¶53 Second, the LDS Church presented Julianne's testimony to show that Jessica and her sister suffered abuse similar to Julianne's. All three girls were under the age of 10 when the abuse started, and all abuse took place in the family home, where Taylor was the father figure and could isolate them from their mothers. All three girls were subjected to Taylor's groping, and he either masturbated while lying on top of them or while sitting next to them.

¶54 Third, although Taylor pleaded guilty to criminal charges for the abuse of Jessica and Ashley, and at sentencing apologized to them for violating their trust, he denied the abuse in the civil trial now being appealed. As such, the LDS Church made it clear that Julianne's testimony was presented to rebut this defense to prove the existence of the crime.

¶55 Finally, the trial court read from the *DeVincentis* opinion in order to articulate its balancing of probative value and prejudicial effect. The trial court stated:

> The *DeVincentis* court, on [p]age 23, indicates:

> "The trial court then balanced the probative value against the prejudicial effect. The trial court recognized that substantial probative value is needed to outweigh the prejudicial effect of ER 404(b) evidence. Oral argument on this issue before the trial court reflected that court's understanding of relevant factors used in balancing, such as the age of the victim, the need for the evidence, the secrecy surrounding sex abuse offenses, the vulnerability of the victims, the absence of physical proof of the crime, degree of public opprobrium associated with the accusation, [and the] general lack of confidence in the ability of a jury to assess the credibility of child witnesses. After balancing these factors, the trial court found that the testimony of V.C. was the main evidence corroborating the testimony of K.S. No less inflammatory documentation or corroboration that the crime occurred was available. Although K.S. was old enough to clearly testify, on balance the probative value of V.C.'s testimony outweighed the prejudicial effect."

> I will so find, and will admit it for the same, exact reasons indicated in the *DeVincentis* opinion that I have just quoted.

¶56 The trial court then agreed with Taylor's attorney that under the *DeVincentis* opinion, a limiting instruction was necessary to ensure that the jury understood the limited purpose of such evidence. *See also DeVincentis*, 150 Wn.2d at 20 n.3. The trial court instructed the parties to construct such an instruction.

¶57 While the trial court's oral ruling may not have been as detailed as that offered in *DeVincentis*, the record shows that the necessary analysis was conducted in determining whether the testimony fell under the common scheme or plan exception to ER 404(b). We conclude that the trial court did not abuse its discretion when it admitted Julianne's testimony.

¶58 Even if the trial court erred when it admitted Julianne's testimony, it would be harmless error for two

reasons. First, a trial court's failure to articulate its balancing process is harmless error where the record as a whole is sufficient to allow effective appellate review of the trial court's decision. *State v. Bowen*, 48 Wn. App. 187, 191, 738 P.2d 316 (1987). Second, "[a]ny error in the admission of prior misconduct evidence is harmless unless the reviewing court finds that 'within reasonable probabilities . . . the outcome of the trial would have been different if the error had not occurred.'" *State v. Carleton*, 82 Wn. App. 680, 686, 919 P.2d 128 (1996) (second alteration in original) (quoting *State v. Jackson*, 102 Wn.2d 689, 695, 689 P.2d 76 (1984)). Here, the record, nearly 3,000 pages of verbatim reports of proceedings, contains numerous accounts from a variety of sources of Taylor's abuse of his stepdaughters. He pleaded guilty to the same in 2001. He confessed to and was disciplined by the LDS Church for his transgressions. The record is sufficient to show that even without Julianne's testimony, the outcome of the trial regarding Taylor's liability would have been the same. We conclude that even if the trial court erred in admitting Julianne's testimony, such error would not have affected the outcome and was not reversible.

## IV. *Damages*

### A. Tegman[10]

¶59 The jury segregated the damages by finding that Taylor's intentional acts (outrage) caused $1.2 million in damages, while the church's intentional acts (outrage) caused $1.1 million in damages. The jury also segregated damages for intentional acts from the damages for the LDS Church's negligence, awarding a separate $880,000 for the church's negligence. But the trial court granted judgment *jointly and severally* amongst all defendants for both the negligence claims as well as the intentional tort claims. As a result, the LDS Church could potentially be held respon-

---

[10] *Tegman v. Accident & Med. Investigations, Inc.*, 150 Wn.2d 102, 75 P.3d 497 (2003).

sible for payment of all of the damages claimed in the intentional torts allegations.

¶60 First, because we reverse the negligence claim against the LDS Church, it cannot be held liable for the damages arising from that claim, i.e., the continued sexual abuse of Jessica by Taylor and the subsequent sexual abuse of Ashley by Taylor.

¶61 Second, despite Osborne's argument to the contrary, it was appropriate to segregate damages resulting from negligence from those resulting from intentional acts. It was *inappropriate* to hold negligent defendants (the LDS Church) jointly and severally liable for damages caused by the intentional acts of Taylor. *See Tegman*, 150 Wn.2d 102. The *Tegman* court examined the relevant sections of the tort reform act pertaining to joint and several liability. Noting language in RCW 4.22.070 that reads, "the trier of fact shall determine the percentage of the total *fault*" (emphasis added), the *Tegman* court concluded that "[*i*]*ntentional acts are not considered and this determination of 'fault' percentages is thus limited to acts that are negligent, reckless, or that subject the actor to strict liability.*" *Tegman*, 150 Wn.2d at 111 (emphasis added). Accordingly, the *Tegman* court held that "under RCW 4.22.070 the damages resulting from negligence *must* be segregated from those resulting from intentional acts, and the negligent defendants are jointly and severally liable only for the damages resulting from their negligence. *They are not jointly and severally liable for damages caused by intentional acts of others.*" *Id.* at 105 (emphasis added). The *Tegman* court was careful to note that the exception contemplated by RCW 4.22.070(1)(b), pertaining to fault-free plaintiffs, requires joint and several liability *only* among *negligent* defendants. "RCW 4.22.070(1)(b) does not concern any liability for damages caused by intentional acts or omissions and, therefore, does not address joint and several liability for intentional acts or omissions." *Tegman*, 150 Wn.2d at 113.

¶62 Osborne and the amicus (Washington State Trial Lawyers Association Foundation) argue that *Tegman* does not apply. They contend that the *Tegman* "court did not specifi-

cally address [a] situation ... where the intentional conduct would not have happened but for the negligent conduct." But the facts in *Tegman* show that the negligent actors there had a duty to protect their client against the intentional acts of their employer.[11] While the *Tegman* dissent argued that under some circumstances a court could logically hold a negligent tortfeasor liable for failing to prevent another from intentionally causing injury, the *Tegman* majority rejected that approach. Consequently, under the *Tegman* court's articulation of the tort reform act, the trial court erred when it ordered the LDS Church jointly and severally liable for Taylor's intentional torts. We note that this does *not* absolve the church of its responsibility for the damages resulting from its own intentional tort of outrage.

### B. *Segregation of Damages*

¶63 The LDS Church argues that the trial court erred when it instructed the jury that the church bears the burden of segregating the damages for negligence from the damages for intentional torts under *Cox v. Spangler*, 141 Wn.2d 431, 5 P.3d 1265 (2000).

¶64 As a threshold matter, fault based damages must be segregated. The Supreme Court articulated the principle that

[u]nder comparative fault principles, the *trier of fact must allocate fault* between a negligent plaintiff and a negligent defendant. RCW 4.22.005. Similarly, under RCW 4.22.070(1), where the damages result from both intentional acts and omissions and "fault," i.e., negligence, recklessness, and conduct subjecting the actor to strict liability, the damages resulting from the intentional acts and omissions must be segregated from damages that are fault-based.

---

[11] In *Tegman*, two attorneys worked for an individual who they knew was engaged in the unauthorized practice of law and other questionable conduct. The attorneys failed to warn clients, Tegman among them, that their employer was not a licensed attorney. That unlicensed individual settled Tegman's case without her permission and forged her signature. Tegman sued all parties on a number of grounds. The attorneys, along with their employer, were held liable for negligence and legal malpractice. The trial court held them liable jointly and severally for both negligent and intentional acts.

*Tegman*, 150 Wn.2d at 117 (emphasis added). Despite the dissent's concern that requiring segregation by the fact finder would be baffling, the *Tegman* majority stated,

> Segregating fault-based damages from those caused by intentional acts or omissions should pose no great difficulty because similar allocations are already part of the statutory scheme. When this State's legislature rejected the absolute bar of contributory negligence to recovery by negligent plaintiffs and adopted comparative negligence principles, Laws of 1973, 1st Ex. Sess., ch. 138, § 1, the "premise that wrongs were inherently indivisible or that responsibility could not rationally be apportioned among multiple parties fell into disfavor."

*Id.* at 116 (quoting Gregory C. Sisk, *The Constitutional Validity of the Modification of Joint and Several Liability in the Washington Tort Reform Act of 1986*, 13 U. PUGET SOUND L. REV. 433, 437 (1990)).

¶65 The next question is who has the burden to prove the segregation of damages. Federal District Court Judge Ricardo Martinez rejected an argument similar to Osborne's that a defendant must bear the burden of demonstrating divisible damages before segregation may occur:

> Plaintiff next argues that even if *Tegman* does apply, segregation may only occur if defendant meets its burden of segregating damages. Relying on *Phennah v. Whalen*, 28 Wn. App. 19, [621 P.2d 1304] (1980) and *Cox v. Spangler*, 141 Wn.2d 431, (2000), plaintiff asserts that defendant must show that its harm is actually divisible from that of the intentional tortfeasor before segregation can occur. However, *Tegman* clearly involved indivisible damages, and the court ordered segregation in spite of that fact.

Order Granting Def.'s Mot. to Segregate, *R.K. v. Corp. of President of Church of Jesus Christ of Latter-Day Saints*, No. C04-2338RSM at 4 (W.D. Wash. Aug. 28, 2006). Based on these reasons, the court instructed the jury to segregate damages caused by the intentional conduct of a nonparty from those damages attributable to the defendant's alleged negligence. We believe the analysis was correct. The defen-

dant does not have the burden to prove divisibility or segregation under *Tegman*.

¶66 Amicus Washington State Trial Lawyers Association Foundation urges this court, should it find *Tegman* "troublesome when viewed in light of other Supreme Court precedent," to "harmonize" *Tegman* with *Cox* and other existing cases by requiring that segregation be established *by the defendant as a matter of fact* in order to actually segregate the damages. But we are constrained by the *Tegman* court's clear holding and conclusion that segregation of damages is a role for the trier of fact. No subsequent decisions or actions by the legislature have undermined that holding. Consequently, we conclude that the trial court erred when it instructed the jury that the LDS Church bore the burden of proving the division of damages for the prenotification abuse from the damages for postnotification abuse—this is a task left to the trier of fact.

¶67 However, this erroneous jury instruction is harmless. As noted earlier, the jury already segregated the damages between Taylor's intentional acts and the LDS Church's intentional acts. Because we vacate the jury's negligence finding against the church and vacate the trial court's entry of joint and several liability between the LDS Church and Taylor, we negate any responsibility that the church may have had for damages from prenotification abuse. The church is no longer jointly liable for any of Taylor's acts. This follows the mandate of the *Tegman* court: (1) Even if we had found the LDS Church negligent, it would not have been responsible for damages resulting from Taylor's intentional acts and (2) based on the segregation of damages properly determined by the jury, the LDS Church is liable only for its own intentional acts. There is no need for remand for any party to segregate damages between the prenotification and postnotification abuse.

### C. *Irrational Damages*

¶68 The LDS Church contends that the jury's damages award was irrational because the awards against

each were roughly the same, despite the fact that Taylor inflicted acts that were "intentional, criminal, directly injurious, and far beyond the bounds of civilized conduct" and the church only failed to act.

> If a jury's verdict is tainted by passion or prejudice, or is otherwise excessive, both the trial court and the appellate court have the power to reduce the award or order a new trial. Because of the favored position of the trial court, it is accorded room for the exercise of its sound discretion in such situations. The trial court sees and hears the witnesses, jurors, parties, counsel and bystanders; it can evaluate at first hand such things as candor, sincerity, demeanor, intelligence and any surrounding incidents. The appellate court, on the other hand, is tied to the written record and partly for that reason rarely exercises this power.

*Bingaman v. Grays Harbor Cmty. Hosp.*, 103 Wn.2d 831, 835, 699 P.2d 1230 (1985) (footnotes omitted). "Before passion or prejudice can justify reduction of a jury verdict, it must be of such manifest clarity as to make it unmistakable." *Id.* at 836. Here, the LDS Church filed posttrial motions for judgment as a matter of law and/or for new trial and/or for remittitur. These motions were denied by the trial judge that had presided over trial. The LDS Church does not provide citations to particular instances at trial that improperly aroused the passion and prejudice of the jury. The LDS Church fails to show with unmistakable clarity that passion or prejudice incited the jury. We conclude that the jury's damages award must stand.

V. *Cross-Appeal: Common Law Duty Based on a Special Relationship*

¶69 Osborne cross-appeals, assigning error to the trial court's directed verdict dismissing his claim for negligence based on a common law duty of protection. When reviewing a trial court's decision to deny a motion for a directed verdict, the appellate court applies the same standard as the trial court. *Sing v. John L. Scott, Inc.*, 134 Wn.2d 24, 29, 948 P.2d 816 (1997). Granting a motion for a

directed verdict is appropriate when, viewing the evidence most favorable to the nonmoving party, the court can say, as a matter of law, there is no substantial evidence or reasonable inference to sustain a verdict for the nonmoving party. *Id.*

¶70 The dispositive case here is *C.J.C.*, 138 Wn.2d 699. There, the perpetrator was a deacon who was "entrusted with various leadership positions within the church that allegedly provided extensive contact with and authority over children." *Id.* at 720. He also baby-sat the victims in order that their father could travel on church business. The church was aware of this arrangement. Importantly, a volunteer with the church had been previously alerted that the perpetrator had conducted inappropriate sexual advances toward a young girl. *Id.* This volunteer was concerned enough that he "watched, listened and observed" the perpetrator but did not prevent his interaction with the church youth. *Id.*

¶71 In determining whether a common law duty of protection existed, our Supreme Court noted that "[i]n particular, we find the conjunction of four factors present in the case before us decisive to finding the existence of a duty is not foreclosed as a matter of law: (1) the special relationship between the Church and [the abuser]; (2) the special relationship between the Church and the plaintiffs; (3) the alleged knowledge of the risk of harm possessed by the Church; and (4) the alleged causal connection between [the abuser's] position in the Church and the resulting harm." *Id.* at 724.

> Where a protective special relationship exists, a principal is not free to ignore the risk posed by its agents, place such agents into association with vulnerable persons it would otherwise be required to protect, and then escape liability simply because the harm was accomplished off premises or after hours. Under these facts, the focus is not on where or when the harm occurred, but on whether the Church or its individual officials negligently caused the harm by placing its agent into association with the plaintiffs when the risk was, or should have been, known.

*Id.* The Supreme Court examined the circumstances presented, noting that

> Wilson [the perpetrator] was a prominent member of the Church, placed into positions of trust over children. This position not only brought him into close connection with the children of the congregation, it allegedly inspired confidence to place the plaintiffs into his care. . . . *Given the Church's specific and superior knowledge of the facts,* a jury could reasonably find the Church knew or should have known the children of its congregation, and specifically these particular plaintiffs, were exposed to an unreasonable risk of harm at the hands of Wilson.

*Id.* at 725-26 (emphasis added). The Supreme Court concluded that the church and its volunteer "owed a duty of reasonable care to affirmatively act to prevent the harm, in view of their relationship to the plaintiffs, their relationship to [the abuser], and *given the knowledge they allegedly possessed.*" *Id.* at 727 (emphasis added). The court noted that "[w]hether there was a causal connection between the harm and the fact of [the abuser's] position in the Church, or whether the risk of harm was or should have been reasonably foreseen at the time the harm occurred, are questions of fact to be determined by the jury." *Id.* The court cautioned that its holding is limited:

> We do not suggest that a principal is an insurer against all harm occasioned by its agents simply because the work situation fortuitously provides an opportunity to perpetrate the harm. Nor do we decide that knowledge of potential harm alone is sufficient to give rise to a duty to warn in all cases. We do hold that where a special protective relationship exists a principal may not turn a blind eye to a known or reasonably foreseeable risk of harm posed by its agents toward those it would otherwise be required to protect simply because the injury is arbitrarily perpetrated off premises or after hours.

*Id.*

¶72 There are two important distinctions between *C.J.C.* and the case at hand. The first is the lack of a causal connection between the LDS Church and Taylor's presence

in the family home. Taylor, although a high priest, was not placed by the LDS Church in the plaintiffs' home. Testimony from other witnesses indicated that while a high priest is a position of respect, it is a relatively common title among adult male Mormons who are active in the LDS Church. Dianne Osborne testified that although Taylor's status as a high priest "was something I had a lot of respect for him for," she did not know whether it played a role in her decision to marry him. So, although the trial court found that there was a special relationship between the LDS Church and the plaintiffs because of their church membership, it also noted that, unlike *C.J.C.*,

> Mrs. Osborne married Mr. Taylor of her own free will. She . . . believed that she was getting someone who shared similar religious beliefs and similar philosophical and life's opinions as she, and that she was doing the right thing. Naturally, it's not unusual for people of one faith to look for someone of their similar faith to make a match, to get married. . . . So, the Mormon church had nothing to do with that.

¶73 Second, the LDS Church, unlike the church in *C.J.C.*, had not been warned that Taylor had previously abused children or made inappropriate advances toward them. Taylor moved into the family home in 1988. It wasn't until 1994 or 1995 that Jessica sought Bishop Hatch's counsel regarding the abuse. The record shows that there were no allegations that the LDS Church possessed knowledge of the risk of harm prior to 1994 or 1995. The trial court did not err when it determined as a matter of law that there was no causal connection between Taylor's presence in the home and the LDS Church, and as such, the LDS Church did not owe a common law duty of protection to the plaintiffs.

¶74 We affirm the jury verdict on claims of outrage against both Taylor and the LDS Church but vacate the finding of joint and several liability. We reverse the jury verdict of negligence against the LDS Church. We affirm that the LDS Church did not owe a common law duty to

protect the plaintiffs. We remand to the trial court for entry of a judgment consistent with this opinion.

COLEMAN and COX, JJ., concur.

Reconsideration denied December 12, 2007.

Review denied at 164 Wn.2d 1009 (2008).