[No. 84098-9.   En Banc.]
Argued October 28, 2010.      Decided February 17, 2011.

BREEAN BEGGS, *as Personal Representative and as Limited Guardian*, ET AL., *Petitioners*, v. THE DEPARTMENT OF SOCIAL AND HEALTH SERVICES ET AL., *Defendants*, DAVID FREGEAU ET AL., *Respondents*.

*Allen M. Ressler, Timothy R. Tesh, Cynthia Novotny*, and *John C. Dorgan* (of *Ressler & Tesh PLLC*), for petitioners.

*Brian T. Rekofke*; *Geana M. Van Dessel* (of *Witherspoon Kelley Davenport & Toole PS*); and *James B. King* and *Christopher J. Kerley* (of *Evans, Craven & Lackie PS*), for respondents.

*Bryan P. Harnetiaux* and *George M. Ahrend* on behalf of Washington State Association for Justice Foundation, amicus curiae.

¶1 SANDERS, J.[*] — Tyler DeLeon died on his seventh birthday of dehydration and starvation—a result of neglect and abuse by his adoptive mother, Carole DeLeon, despite investigations of the DeLeon home by Child Protective Services (CPS). Tyler's adoptive siblings and the personal representative of his estate brought wrongful death and survival actions against the Department of Social and Health Services (DSHS), individual employees of DSHS, Dr. David Fregeau (Tyler's primary care physician), Rockwood Clinic (Dr. Fregeau's employer), and Dr. Sandra Bremner-Dexter (Tyler's psychiatrist). Petitioners also sued Dr. Fregeau, Rockwood Clinic, and Dr. Bremner-Dexter for medical malpractice and failure to report suspected child abuse.

---

[*] Justice Richard Sanders is serving as a justice pro tempore of the Supreme Court pursuant to Washington Constitution article IV, section 2(a).

¶2 Rockwood Clinic and the doctors filed two motions for partial summary judgment in the superior court, seeking dismissal of the wrongful death and survival actions and dismissal of the action for failure to report suspected child abuse. The superior court granted the motions. Division Three of the Court of Appeals granted discretionary review of both partial summary judgment orders and certified the case to this court. We affirm the partial summary judgment orders in result and remand to the superior court for further proceedings.

## FACTS

¶3 Between 1997 and 2002, DSHS placed Tyler DeLeon and six other children in Carole DeLeon's home as foster children.[1] The State later assisted Carole DeLeon's adoption of Tyler DeLeon and three other children. There were 23 CPS referrals alleging physical and/or sexual abuse and neglect in the home, at least 3 of which involved injuries to Tyler. In June 1999, Tyler fractured his femur and had bruises all over his body. In July 1999, Tyler's two front teeth were knocked out. In April 2004, Tyler arrived at school with bruises on his cheeks and nose and a 1.5 inch mark on his side, a result of being kicked down the stairs. During his time in Carole DeLeon's home, Tyler's weight dropped from the 50th percentile to the 5th percentile for his age. He weighed 28 pounds when he died on his seventh birthday, January 13, 2005.

¶4 Carole DeLeon received more than $220,000 from the State between October 1997 and April 2005 to support the children placed in her home. DSHS paid more than $50,000 in foster care support and adoption support for Tyler. At the time of his death, DSHS was paying Carole DeLeon $717 per month for Tyler's care pursuant to an adoption support agreement signed by Carole DeLeon and the State in August 2003.

---

[1] Because this matter was resolved on summary judgment, this summary of the facts is drawn from the parties' motions and briefs in the superior court, collected and designated as clerk's papers (CP) on appeal.

¶5 After Tyler's death, DSHS removed the other children from the DeLeon home and stopped all support payments. Without the payments Carole DeLeon could not make ends meet, as demonstrated by a home mortgage refinancing application she filed 10 months after Tyler's death and 7 months after the other children were removed from the home. Carole DeLeon later claimed she took the children into her home as a way to finance her house.

¶6 Tyler DeLeon died leaving no last will and testament; his surviving heirs are his siblings.[2] Breean Beggs is the personal representative of Tyler's estate and guardian ad litem for five of the siblings.[3] Beggs filed wrongful death and survival actions against DSHS, employees of DSHS,[4] Rockwood Clinic, Dr. Fregeau, and Dr. Bremner-Dexter. Beggs claimed Dr. Fregeau knew of Tyler's dramatic weight loss and the numerous reports to CPS regarding Tyler.[5] Beggs claimed Dr. Fregeau was also aware of the severe weight loss of the other children in the DeLeon home. Beggs claimed Dr. Bremner-Dexter knew of Tyler's weight loss, stunted growth, and behavioral problems and the CPS referrals regarding Tyler.

¶7 Rockwood Clinic and the doctors (collectively the doctors) filed two motions for partial summary judgment. First, the doctors moved to dismiss Beggs' wrongful death and survival actions on the ground Tyler's siblings were not "dependent" on him as required by the wrongful death and

---

[2] Under the slayer statute, Carole DeLeon, Tyler's adoptive mother, cannot receive any property or benefit from his death because she caused his death. RCW 11.84.020. She is deemed to have predeceased him. RCW 11.84.030.

[3] Another minor sibling, represented by a different guardian ad litem, and an adult sibling are also petitioners. For the sake of brevity we refer to the petitioners by Beggs' name only.

[4] The State and its employees settled with the petitioners and are no longer parties to this action.

[5] In her complaint, Beggs alleged Dr. Fregeau received a letter from a CPS adoption social worker expressing concern about Tyler's condition and a written request from Tyler's school nurse to verify whether there were restrictions on Tyler's fluid intake. CP at 14-15. Beggs also alleged Dr. Fregeau was a member of a child protection team that investigated reports of abuse in the DeLeon home in 2004. *Id.* at 15.

survival action statutes. Second, the doctors moved to dismiss any civil action implied by RCW 26.44.030 (the mandatory reporting statute), claiming chapter 7.70 RCW (the medical malpractice statute) precluded the claim. The superior court granted the motions for partial summary judgment.[6] Beggs sought discretionary review of both superior court orders. Division Three of the Court of Appeals granted review and certified the case to this court. This court accepted certification.

## ISSUES

¶8 1. Does RCW 26.44.030 imply a cause of action against health care providers, independent of chapter 7.70 RCW?

¶9 2. Were Tyler's adoptive siblings dependent on Tyler for support under the wrongful death and survival action statutes based on the DSHS adoption support payments Carole DeLeon received for Tyler?

## STANDARD OF REVIEW

¶10 The standard of review of an order of summary judgment is de novo. *Aba Sheikh v. Choe*, 156 Wn.2d 441, 447, 128 P.3d 574 (2006). Statutory interpretation is a question of law reviewed de novo. *State v. Schultz*, 146 Wn.2d 540, 544, 48 P.3d 301 (2002).

## ANALYSIS

I. RCW 26.44.030 implies a cause of action against a mandatory reporter who fails to report suspected child abuse

¶11 The issue of whether RCW 26.44.030, the mandatory child abuse reporting statute, implies a cause of action

---

[6] Beggs also brought medical malpractice claims against Dr. Fregeau, Rockwood Clinic, and Dr. Bremner-Dexter that were not dismissed by the superior court's orders granting partial summary judgment.

against a professional named in the statute who fails to report suspected abuse is a matter of first impression.[7]

¶12 The Court of Appeals has held RCW 26.44.030 implies a civil remedy against a mandatory reporter who fails to report suspected abuse. *Jane Doe v. Corp. of President of Church of Jesus Christ of Latter-Day Saints*, 141 Wn. App. 407, 423, 167 P.3d 1193 (2007). Citing this court's decision in *Tyner v. Department of Social & Health Services*, 141 Wn.2d 68, 1 P.3d 1148 (2000), the court stated, "If the legislature intended a remedy for parent victims of negligent child abuse investigations, it is reasonable to imply an intended remedy for child victims of sexual abuse when those required to report the abuse fail to do so." 141 Wn. App. at 422.[8] "[I]mposing civil consequences for failure to report motivates mandatory reporters to take action to protect victims of childhood sexual abuse." *Id.* Before deciding whether health care providers are exempt from a cause of action arising under RCW 26.44.030, we first must determine whether such an action exists.[9]

---

[7] This court has held RCW 26.44.050, the section requiring law enforcement or DSHS to investigate a report of suspected abuse, implied a civil remedy for a parent who was negligently investigated. *Tyner v. Dep't of Soc. & Health Servs.*, 141 Wn.2d 68, 80, 1 P.3d 1148 (2000). We held the statute's declaration of purpose showed the legislature contemplated parents' interests, and "by recognizing the deep importance of the parent/child relationship, the Legislature intends a remedy for both the parent and the child if that interest is invaded." *Id.*

[8] Though *Jane Doe* involved allegations of sexual abuse, the statute makes no distinction in the reporting requirements for suspected sexual or physical abuse. *See* RCW 26.44.020(1) (defining "[a]buse or neglect").

[9] The majority of jurisdictions deciding this issue have found no implied cause of action in state reporting statutes. *See, e.g., Cuyler v. United States*, 362 F.3d 949 (7th Cir. 2004) (applying Illinois law); *Becker v. Mayo Found.*, 737 N.W.2d 200 (Minn. 2007). *See generally* Danny R. Veilleux, Annotation, *Validity, Construction, and Application of State Statute Requiring Doctor or Other Person To Report Child Abuse*, 73 A.L.R.4TH 782 (1989). However, at least two states have found implied causes of action in reporting statutes. *See Ham v. Hosp. of Morristown, Inc.*, 917 F. Supp. 531 (E.D. Tenn. 1995) (finding an implied cause of action in the Tennessee reporting statute); *Landeros v. Flood*, 17 Cal. 3d 399, 551 P.2d 389, 131 Cal. Rptr. 69 (1976) (holding a violation of the statute's mandate to report may constitute negligence per se).

## A. RCW 26.44.030 implies a civil remedy

¶13 RCW 26.44.030 requires the named professionals, including health care practitioners, with "reasonable cause to believe that a child has suffered abuse or neglect" to report the suspected abuse to DSHS or the proper law enforcement agency. RCW 26.44.030(1)(a). The statutory definition of "practitioner" includes "a person licensed by this state to practice . . . medicine and surgery or to provide other health services." RCW 26.44.020(16). A mandatory reporter named in RCW 26.44.030 who knowingly fails to report suspected child abuse "shall be guilty of a gross misdemeanor." RCW 26.44.080. The statute does not explicitly provide a civil remedy for a child who suffers further injury against a mandatory reporter who failed to report suspected abuse.

¶14 In *Bennett v. Hardy*, 113 Wn.2d 912, 920-21, 784 P.2d 1258 (1990), this court explained when a cause of action will be implied from a statute:

> Borrowing from the test used by federal courts in determining whether to imply a cause of action, we must resolve the following issues: first, whether the plaintiff is within the class for whose "especial" benefit the statute was enacted; second, whether legislative intent, explicitly or implicitly, supports creating or denying a remedy; and third, whether implying a remedy is consistent with the underlying purpose of the legislation.

Under this test, RCW 26.44.030 implies a cause of action against a mandatory reporter who fails to report suspected abuse.

¶15 First, victims of child abuse are certainly within the class for whose "special" benefit the legislature enacted the reporting statute, as this court has acknowledged. *State v. Warner*, 125 Wn.2d 876, 891, 889 P.2d 479 (1995) ("The reporting statute is designed to secure prompt protection and/or treatment for the victims of child abuse. The class of persons it is designed to protect is the victims, not the abusers.").

¶16 Second, the statute implicitly supports a civil remedy. This court " 'can assume that the legislature is aware of the doctrine of implied statutory causes of action,' " even where the statute is silent as to civil remedies. *Bennett*, 113 Wn.2d at 919 (quoting *McNeal v. Allen*, 95 Wn.2d 265, 277, 621 P.2d 1285 (1980) (Brachtenbach, J., dissenting)). Chapter 26.44 RCW provides immunity from civil liability to "[a] person who, in good faith and without gross negligence, cooperates in an investigation arising as a result of a report made pursuant to this chapter." RCW 26.44.060(5). "A grant of immunity from liability clearly implies that civil liability can exist in the first place." *Jane Doe*, 141 Wn. App. at 422-23. RCW 26.44.030 imposes a duty to report suspected child abuse on the named professionals. The statutory scheme supports an implied cause of action for a failure to fulfill that duty.

¶17 Finally, an implied cause of action is consistent with the underlying purpose of the statute. RCW 26.44.010, the statute's declaration of purpose, states, "It is the intent of the legislature that . . . protective services shall be made available in an effort to prevent further abuses, and to safeguard the general welfare of such children." Further, when the legislature amended the reporting statute in 1985, it declared, "Governmental authorities must give the prevention, treatment, and punishment of child abuse the highest priority, and all instances of child abuse must be reported to the proper authorities . . . ." LAWS OF 1985, ch. 259, § 1.[10] Implying a civil remedy as a means of enforcing the mandatory reporting duty is consistent with this intent.

---

[10] The doctors argue the legislature's enactment of the medical malpractice statute in 1976, five years after it adopted the reporting statute, demonstrates an intent to subsume within the malpractice liability scheme any civil remedy for a failure to report suspected abuse. But the legislature has frequently amended the reporting statute, including the 1985 amendment in which it declared the State should give the prevention of child abuse "the highest priority." LAWS OF 1985, ch. 259, § 1. The legislature made that declaration with full knowledge of the medical malpractice statute. *See Thurston County v. Gorton*, 85 Wn.2d 133, 138, 530 P.2d 309 (1975) ("The legislature is presumed to enact laws with full knowledge of existing laws."). The legislature did not carve out an exception for medical practitioners who fail to report abuse.

### B. A doctor's duty to report suspected child abuse is not necessarily health care

¶18 The doctors argue any civil remedy implied by RCW 26.44.030 does not apply to health care providers because the legislature created a separate liability scheme for negligent health care in chapter 7.70 RCW, the medical malpractice statute. RCW 7.70.010 provides, "The state of Washington, exercising its police and sovereign power, hereby modifies . . . certain substantive and procedural aspects of all civil actions and causes of action, whether based on tort, contract, or otherwise, for damages for injury occurring as a result of heath care." Chapter 7.70 RCW provides the exclusive remedy for damages for injuries resulting from health care. *Branom v. State*, 94 Wn. App. 964, 969, 974 P.2d 335 (1999). It also determines whether an injury is actionable. *Id.*; *see* RCW 7.70.030.

¶19 Chapter 7.70 RCW does not define "health care." The Court of Appeals has defined the term to mean " 'the process in which [the physician] was utilizing the skills which he had been taught in examining, diagnosing, treating or caring for the plaintiff as his patient.' " *Estate of Sly v. Linville*, 75 Wn. App. 431, 439, 878 P.2d 1241 (1994) (quoting *Tighe v. Ginsberg*, 146 A.D.2d 268, 271, 540 N.Y.S.2d 99 (1989)). This is consistent with a common dictionary definition. *Berger v. Sonneland*, 144 Wn.2d 91, 109, 26 P.3d 257 (2001) (quoting THE AMERICAN HERITAGE DICTIONARY 833 (3d ed. 1992)).

¶20 The doctors argue their reporting duty could arise only when providing Tyler health care because they acted in the course of their employment and in the context of a doctor-patient relationship. However, everything within a doctor-patient relationship is not necessarily health care. *See Linville*, 75 Wn. App. at 438, 440 (holding misrepresentations by a doctor about another doctor's previous care of the patient, though "made during the course of the physician/patient relationship," did not "automatically render them 'health care' "); *see also Bundrick v. Stewart*, 128 Wn.

App. 11, 17, 114 P.3d 1204 (2005) (finding chapter 7.70 RCW does not supersede the common law cause of action for medical battery for an injury "arising from health care to which the plaintiff gave *no* consent").

¶21 A doctor's duty under RCW 26.44.030(1)(a) to report suspected child abuse does not necessarily arise while the doctor is providing health care. The statute imposes the duty on medical practitioners and other health care providers, but also on school and child care personnel, juvenile probation officers, law enforcement officers, pharmacists, and social service counselors. These professionals do not have to provide health care to form a "reasonable cause to believe that a child has suffered abuse or neglect." RCW 26.44.030(1)(a). The mandatory reporters do not have skills or special knowledge in common; rather, the commonality among the class of mandatory reporters is primary and frequent contact with children who might be at risk of abuse. A teacher can form a "reasonable cause to believe" a child has been abused without providing health care. Similarly, a doctor, acting in the course of his professional employment, can also form a "reasonable cause to believe" a child has been abused without employing the special skills in " 'examining, diagnosing, treating or caring' " required to provide health care. *Linville*, 75 Wn. App. at 439 (quoting *Tighe*, 146 A.D.2d at 271).

¶22 The reporting statute supports a distinction between a doctor's "reasonable cause to believe" abuse has occurred and a doctor's expert opinion based on examination, diagnosis, treatment, or care. A report based on a "reasonable cause to believe" formed by a doctor or any other professional named in RCW 26.44.030(1)(a) triggers an investigation by DSHS. In contrast, a report based on a doctor's "expert medical opinion" triggers dependency proceedings under RCW 26.44.030(8) unless another doctor contradicts the report. RCW 26.44.030(1)(a) requires a lower threshold of suspicion, a threshold that can be met without utilizing the special skills required to provide health care. Chapter 7.70 RCW does not preclude Beggs' claim against the doctors under RCW 26.44.030(1)(a).

II. Tyler's siblings were not substantially dependent under the wrongful death statute

   A. Second tier beneficiaries under the wrongful death statute may recover only if they were dependent on the deceased

¶23 Beggs brought actions under RCW 4.20.010, .020, .046, and .060. The beneficiaries allowed by RCW 4.20-.046 and .060 are those beneficiaries allowed by RCW 4.20-.020, the wrongful death statute.[11] RCW 4.20.020 provides:

> Every such action shall be for the benefit of the wife, husband, state registered domestic partner, child or children, including stepchildren, of the person whose death shall have been so caused [under RCW 4.20.010]. If there be no wife, husband, state registered domestic partner, or such child or children, such action may be maintained for the benefit of the parents, sisters, or brothers, who may be dependent upon the deceased person for support, and who are resident within the United States at the time of his death.

RCW 4.20.020 establishes two classes of beneficiaries. First tier beneficiaries do not need to demonstrate dependency to recover. "Because of the nature of their relationship to the decedent, the first class, consisting of the immediate family . . . is, as a matter of course, considered to have sustained some pecuniary loss and is not therefore required to prove dependency upon the deceased for support." J. Gregory Casey, Comment, *Washington Wrongful Death and Survival Actions*, 6 Gonz. L. Rev. 314, 316-17 (1971). In contrast, second tier beneficiaries, who may recover only if there are no first tier beneficiaries, "normally do[ ] not possess this special relationship" and therefore must establish dependency to recover. *Id.* at 317; *see also Armantrout v. Carlson*, 166 Wn.2d 931, 935, 214 P.3d 914 (2009) ("As part of the

---

[11] RCW 4.20.010 creates the cause of action for wrongful death, but RCW 4.20.020 defines the beneficiaries of the action.

original code of Washington, the wrongful death statute has always required second tier beneficiaries to demonstrate their dependence on the decedent."). Tyler's adoptive siblings, second tier beneficiaries, may recover under RCW 4.20.020, .046, and .060 only if they were dependent upon him for support.

¶24 The wrongful death statute does not define "dependent upon the deceased person for support." This court first interpreted the statutory language in *Bortle v. Northern Pacific Railway*, 60 Wash. 552, 554, 111 P. 788 (1910), stating:

> [W]e would not give it such a strict construction as to say it means wholly dependent, or that the parent must have no support or livelihood other than the deceased, such a construction being too harsh and not in accordance with the humane purpose of the act. Nevertheless, there must be some degree of dependency, some substantial dependency, a necessitous want on the part of the parent, and a recognition of that necessity on the part of the child.[12]

Though *Bortle* determined the dependency of a parent on a deceased child, the same standard of substantial dependency applies when the second tier beneficiary is a sibling of the decedent. *See Estes v. Schulte*, 146 Wash. 688, 689, 264 P. 990 (1928) (finding an adult sister dependent on her deceased adult brother).

¶25 The beneficiary must depend upon the decedent financially or for services. *See Armantrout*, 166 Wn.2d at 938 (holding, "the statute does not limit 'support' to monetary contributions" and allowing recovery under RCW

---

[12] We do not read *Bortle*'s language stating that there must be recognition of dependency on the part of the child as imposing a requirement that a child who provides financial support to family members must do so voluntarily or with affirmative knowledge of their need. This makes little sense in the context of a young child whose public benefit payments support the family and adds nothing to the analysis of dependency. Properly understood, the language in *Bortle* simply confirms that the degree of dependency must be real and substantial and will not arise from occasional gifts or gratuities. *See Bortle*, 60 Wash. at 554 (finding the deceased son's occasional gifts to his parents did not establish their dependency); *see also Mitchell v. Rice*, 183 Wash. 402, 405, 48 P.2d 949 (1935) (holding casual gifts insufficient to show dependency).

4.20.020 for loss of medical and other services provided by the decedent to her disabled mother); *Philippides v. Bernard*, 151 Wn.2d 376, 384-85, 88 P.3d 939 (2004) (holding the legislature's expansion of support under RCW 4.24.010, the child death statute, to include emotional support did not abolish the financial support requirement for second tier beneficiaries in RCW 4.20.020). Government support payments received by the decedent may be the basis of a beneficiary's dependency. *See Armantrout v. Carlson*, 141 Wn. App. 716, 723, 725, 170 P.3d 1218 (2007), *rev'd on other grounds*, 166 Wn.2d at 941.

> B. Tyler's adoptive siblings were not substantially dependent on his adoption support payments

¶26 Beggs claims Tyler's adoptive siblings substantially depended on him for support because DSHS provided $717 per month in adoption support to Carole DeLeon for Tyler. Beggs claims Carole DeLeon's mortgage refinancing application, filed after all DSHS payments ceased upon Tyler's death and the removal of the other children from her home, demonstrates the household's dependency on the adoption support payments.

¶27 DSHS determines eligibility for adoption support pursuant to chapter 74.13A RCW. RCW 74.13A.025 provides, in pertinent part:

> The factors to be considered . . . in setting the amount of any payment or payments . . . shall include: The size of the family including the adoptive child, the usual living expenses of the family, the special needs of any family member including education needs, the family income, the family resources and plan for savings, the medical and hospitalization needs of the family, the family's means of purchasing or otherwise receiving such care, and any other expenses likely to be needed by the child to be adopted.

Child support payments may change from year to year or be discontinued "[d]ue to changes in economic circumstances or the needs of the child." RCW 74.13A.025.

¶28 DSHS regulations promulgated under former chapter 74.13 RCW (2002) repeat the considered factors and stipulate that "[t]he payment that is agreed upon should combine with the parents' resources to cover the ordinary and special needs of the child projected over an extended period of time." WAC 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(1). "The department and the adoptive parents will jointly determine the level of adoption support cash payments needed to meet the basic needs of the child without creating a hardship on the family." WAC 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(3). If the child is removed from the adoptive parent's home and placed in a foster or group home, DSHS "must discontinue any cash payments to the adoptive parent during the child's out-of-home placement unless the adoptive parent(s) documents continuing expenses directly related to the child's needs." WAC 388-27--0265(2).

¶29 Pursuant to the statutes and regulations, the State provides adoption support payments for the care of the particular child and to supplement the family's own contribution to the child's support. DSHS considers family circumstances, including the needs of other children in the home, but only as possible limitations on the parent's ability to contribute resources to the adopted child's care. Adoption support payments are not meant to provide a profit to the adoptive parent, nor are they meant to support other members of the family.

¶30 Beggs argues the contract between Carole DeLeon and DSHS allowed Carole DeLeon to pool Tyler's support payments with other family resources upon which all of the siblings depended. Beggs argues the contract contained an exclusive list of Carole DeLeon's responsibilities and did not limit her use of the support payments. However, the contract explicitly references the statutes and regulations authorizing DSHS support payments.[13] Carole DeLeon

---

[13] The contract included the following language:

This Agreement incorporates by reference the applicable provisions of RCW 74.13 and WAC 388-27 relating to adoption support for adoptive parents,

agreed to support Tyler with her own resources; the State agreed to supplement that support.

¶31 Under the statutory scheme, we reject Beggs' claim that Tyler's siblings were financially dependent on him by virtue of the DSHS adoption support payments made on his behalf. DSHS provided separate payments to Carole DeLeon to supplement her support of the other children in her home. Tyler's siblings were not substantially dependent on his adoption support payments.

CONCLUSION

¶32 Tyler's siblings are not qualified beneficiaries under RCW 4.20.010, .020, .046, and .060, and we affirm the superior court's partial summary judgment order dismissing Beggs' claims arising under those statutes. Further, because a claim for failure to report suspected child abuse could be brought only as a survival action under RCW 4.20.046 (the general survival action statute) or RCW 4.20.060 (the special survival action statute), we affirm in result the superior court's partial summary judgment order dismissing Beggs' failure-to-report claim. We remand to the superior court for further proceedings on Beggs' remaining claims.

MADSEN, C.J., and C. JOHNSON, CHAMBERS, OWENS, FAIRHURST, J.M. JOHNSON, and STEPHENS, JJ., concur.

¶33 ALEXANDER, J. (concurring/dissenting) — Although I agree with the majority's conclusion that Tyler DeLeon's siblings are not qualified beneficiaries, I disagree with its holdings that (1) a cause of action against health care providers is implied by RCW 26.44.030 and (2) a medical

___

including adoption support payments, specifically the provisions of Chapter 74.13 RCW beginning at Section 74.13.100 and the provisions of Chapter 388-27 WAC beginning at Section 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, and any replacement or successor provisions thereto.

CP at 84.

doctor's duty to report suspected child abuse is not health care. I, therefore, dissent in part for the reasons set forth below.

## I. Does RCW 26.44.030 imply a civil remedy?

¶34 Pursuant to RCW 26.44.030(1)(a), any "practitioner" who has "reasonable cause to believe that a child has suffered abuse or neglect" shall report the suspected abuse to the Department of Social and Health Services or the proper law enforcement agency. A person licensed by the State of Washington to practice medicine is deemed a " 'practitioner.' " RCW 26.44.020(16). A practitioner who knowingly fails to report suspected child abuse "shall be guilty of a gross misdemeanor." RCW 26.44.080.

¶35 The majority concedes that the aforementioned statutes do not explicitly provide a civil remedy against a practitioner who fails to report suspected abuse. It, nevertheless, holds that a civil remedy is implied "as a[n additional] means of enforcing the mandatory reporting duty." Majority at 78. This conclusion, it seems to me, flies entirely in the face of what the plain language of the mandatory child abuse reporting statute indicates the legislature intended. I say that because just as we may assume that the legislature is aware of the doctrine of implied statutory causes of action, we can assume that it knows how to explicitly provide a civil cause of action. It declined to do that and, instead, chose to make it a crime to fail to report child abuse.

¶36 The result I would have us reach is entirely consistent with our decision in *Tyner v. Department of Social & Health Services*, 141 Wn.2d 68, 1 P.3d 1148 (2000), a case in which we did imply a tort remedy in favor of parents and against the State for negligent investigation of allegations of child abuse. Our decision there turned to a great extent on the fact that the statute was silent as to a remedy. As I have indicated, that is not the case here.

¶37 I would, therefore, follow the lead of the majority of jurisdictions in this nation that have found no implied

cause of action in state child abuse reporting statutes. *See* majority at 76 n.9.

## II. Is a doctor's statutory duty to report suspected child abuse health care?

¶38 As the majority observes, the exclusive remedy for damages for injuries resulting from health care is under the provisions of chapter 7.70 RCW. Thus, if the physician's obligation to report suspected child abuse is in the category of health care, the civil remedy the majority says is implied by RCW 26.44.030 is not available to plaintiffs like those in this case. Although "health care" is not defined in chapter 7.70 RCW, the Court of Appeals has appropriately defined "health care" as " 'the process in which [the physician] was utilizing the skills which he had been taught in examining, diagnosing, treating or caring for the plaintiff as his patient.' " *Estate of Sly v. Linville*, 75 Wn. App. 431, 439, 878 P.2d 1241 (1994) (quoting *Tighe v. Ginsberg*, 146 A.D.2d 268, 271, 540 N.Y.S.2d 99 (1989)). This definition of "health care," as the majority acknowledges, is consistent with the dictionary definition. It seems obvious that a physician, or any person in the healing arts, is not caring for a patient if the physician fails to carry out his or her statutory obligation to report suspected child abuse to proper authorities. Indeed, I am of the view that even absent a reporting requirement like that which is set forth in RCW 26.44.030, a caring and honorable physician should report suspected child abuse. I say that because from time immemorial the physician's obligation has been to heal the sick and injured. For a physician to remain silent in the face of his or her opinion that a child patient will continue to suffer abuse if the child's home environment remains unchanged undermines the physician's traditional role to heal those who seek help.[14]

---

[14] Physicians have traditionally observed an oath that is based on the teachings of the Greek physician Hippocrates. A modern version of the so-called Hippocratic oath, penned in 1964 by Dr. Louis Lasagna, a former dean of the School of Medicine at Tufts University, indicates that a physician will apply "all measures [that] are required" for the benefit of the sick. *The Hippocratic Oath: Modern Version*, NOVA, http://www.pbs.org/wgbh/nova/doctors/oath_modern.html (last visited Feb. 10, 2011) (alteration in original).