IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| ESTATE OF RAYMOND L. BELL, by and through Channa Copeland, his Personal Representative; and Northstar Case Management, his Guardian and Conservator,<br><br>Petitioner,<br><br>v.<br><br>STATE OF WASHINGTON, DEPARTMENT of SOCIAL and HEALTH SERVICES; ADULT PROTECTIVE SERVICES and DOES 1-5, individuals and entities,<br><br>Respondents. | No. 86505-6-I<br><br>DIVISION ONE<br><br>UNPUBLISHED OPINION |

CHUNG, J. — Raymond Bell was a vulnerable adult with dementia and other documented health issues.[1] Between February 2020 and July 2021, the Department of Social and Health Services (the Department) received nine separate referrals raising concerns about Bell's health and well-being. Several referrals were made by individuals concerned that Annette Shine, Bell's caretaker and alleged significant other, was financially exploiting Bell and did not have his best interests in mind. After investigation, the Department closed all reports and concluded that any claims of abuse, neglect or exploitation were inconclusive or unsubstantiated. Bell's certified professional guardian, Northstar Case Management (Northstar), filed claims on his behalf against the

---

[1] During the pendency of this appeal, Bell passed away and Channa Copeland, his former guardian, was substituted in his place as personal representative for the Estate of Raymond Bell.

Department, including for an implied statutory cause of action for negligent investigation. The trial court granted the Department's motion for summary judgment dismissing Bell's claims except for the claim of outrage.

A commissioner of this court granted discretionary review of the dismissal of Bell's statutory negligence claim. The sole issue before this court is whether under the abuse of vulnerable adults act (AVAA), chapter 74.34 RCW—specifically, RCW 74.34.063 and .067—a private plaintiff may pursue a claim against the State for negligent investigation or negligent failure to provide protective services.

Applying the test in Bennett v. Hardy, 113 Wn.2d 912, 784 P.2d 1258 (1990), we conclude that although the AVAA grants the Department the authority to investigate referrals of abuse and neglect, it does not mandate it to do so. Further, implying a cause of action against the Department for negligent investigation and failure to provide protective services is not consistent with the statutory purpose. We therefore hold there is no implied statutory cause of action against the State for negligent investigation or ensuing failure to provide protective services and affirm the trial court's order granting summary judgment and dismissing Bell's claim for negligent investigation.

FACTS

Raymond Bell was diagnosed with dementia in January 2020 and had other documented health issues such as diabetes, kidney disease, and hypertension. Bell's dementia diagnosis was associated with memory problems, significant cognitive challenges, and the inability to independently care for himself. Based on these conditions, Bell was considered a vulnerable adult under the AVAA. See RCW 74.34.005(3), (4).

Between February 2020 and July 2021, the Adult Protective Services (APS) subdivision of the Department received nine referrals regarding Bell.[2] The first referral to APS on February 21, 2020, expressed concern for Bell's ability to regularly take his medications and manage his finances. This referral was assigned to APS investigator Katie Condreay. While the first referral investigation was pending, APS received a second referral regarding Bell on March 12, 2020, alleging that Bell may have been financially exploited by an unknown perpetrator who took his car keys, wallet, and jewelry. Bell disclosed to Condreay that he had a friend, Annette Shine, who was being released from prison and would "help take care of him."

As part of Condreay's investigation into the self-neglect and financial exploitation claims, she interviewed Bell at his home on March 18, 2020. Bell explained he was misplacing items and struggling to pay his bills. In her report, Condreay noted that Bell had "accepted a referral for Case Management to assist with obtaining benefits and care coordination" and was assigned a case manager through Aging and Disability Services (ADS). In April 2020, Condreay completed her investigations into the two referrals and determined that the claim of self-neglect was inconclusive and the claim of financial exploitation was unsubstantiated.

On July 23, 2020, APS received its third referral about Bell alleging neglect by Shine, to which APS assigned investigator Alexis Pullen. This referral was prompted by Bell's admission to the hospital on July 15, where he was involuntarily held for monitoring after he allegedly pulled a knife on Shine. While Bell was at the hospital, a

---

[2] Some of the reports identify the reporter. However, other referrals redact the reporter information or may have been made anonymously. See RCW 74.34.067(2) ("[T]he department shall interview the complainant, unless anonymous.").

hospital social worker, Debbie Sullivan, expressed to Pullen that she did not feel that Shine was acting in Bell's best interest and inquired about obtaining guardianship for Bell. Pullen reported that although Bell had been referred to ADS for case management services and was approved for 63 hours per month through the CFC/COPES program,[3] he was not financially eligible. Pullen completed her investigation on August 17. She concluded that the allegation of neglect by Shine was unsubstantiated and that Bell's behavior "was due to progression in his dementia and not as a result of poor care by" Shine.

On August 19, 2020, APS received its fourth referral about Bell alleging financial exploitation by Shine, prompted by Shine's use of Bell's car, allegedly absent his permission. APS investigator Sofia Lawrence completed her investigation on April 14, 2022, finding that the claim of financial exploitation was inconclusive and that "there is contradictory and insufficient evidence to make a clear finding."

On September 25, 2020, APS received its fifth referral regarding Bell, alleging self-neglect for not taking his medications or partaking in self-hygiene. APS investigator Lauren Basnar completed her investigation on April 12, 2021, and found that the claim of self-neglect was unsubstantiated.

---

[3] Community Options Program Entry System (COPES) is "a medicaid home and community-based services (HCBS) waiver program." WAC 182-513-1100. Community First Choice (CFC) is "a medicaid state plan home and community-based service." Id. COPES provides services "for individuals who, in the absence of the home and community-based services and supports provided under COPES, would otherwise require the level of care furnished in a nursing facility." See Washington State Department of Social and Health Services, Long-Term Care Manual, at 7D.1, 7D.3 (last revised 05/2024), https://www.dshs.wa.gov/sites/default/files/ALTSA/hcs/documents/LTCManual/Chapter%207d.pdf. Services covered by the COPES waiver act as a wraparound to services available to the CFC State Plan program. Id. Pullen's report notes that Shine could not act as Bell's COPES caregiver "because she is a felon."

On December 29, 2020, APS received its sixth referral regarding Bell, this one alleging financial exploitation by Shine. The referral was made after Bell attempted to make a cash withdrawal with an expired identification card and was denied. Then, 15-20 minutes later, Shine attempted to cash a check "allegedly signed by" Bell. Basnar completed her investigation on June 10, 2021, and concluded that the claim of financial exploitation was inconclusive.

On April 8, 2021, APS received its seventh report alleging financial exploitation of Bell by Shine, which was assigned to investigator Basnar. Bell alleged that Shine had stolen jewelry from him, including "three gold rings with diamonds, [a] gold necklace, [and] three watches." Shine reported that Bell had directed her to sell the items at a pawn shop on his behalf and return the proceeds to him. However, there were no receipts to demonstrate such sales or who benefitted from the sales. Basnar completed her report on June 10, finding that any claim of financial exploitation was inconclusive.

On June 8, 2021, APS received its eighth referral alleging financial exploitation of Bell by Shine. In October, Basnar communicated with Bell's neighbor Caroline Etienne, who was concerned about Shine's involvement in the sale of Bell's home. Etienne alleged Bell was "forced to pack all of his belongings into a Uhaul [that Shine] got a hold of" and that Shine "took [Bell's] property to an unknown location." Etienne further alleged that Shine took "$600,000 from the sale of [Bell's] home and left [him] with nothing."[4]

On July 6, 2021, APS received its ninth referral about Bell, again alleging financial exploitation by Shine, which was assigned to APS investigator Lawrence. This

---

[4] The appellate record does not indicate whether the APS made a determination regarding these allegations.

5

claim alleged similar issues as before regarding the sale of Bell's home and the location of some of his property. Lawrence interviewed the new owner of Bell's former home, Ms. Behrman. Behrman indicated that Bell had moved out on June 26, 2021, and she was concerned that Shine had manipulated Bell into selling the home because he tried to gain entry on several occasions and "did not appear to know that he no longer resided at the property." On November 1, 2021, Lawrence interviewed Shine about the sale of Bell's home. Shine reportedly stated that Bell took out a $10,000 advance loan to help them move out of the house and place things in storage. The record indicates Bell received "about 178 or 85,000 dollars" for the sale of the house. Shine reportedly stated that Bell received an initial payment of $60,000, which he allegedly wanted to split with Shine "so she could get on her feet and get her own place." Shine reported that Bell gave her two debit cards "that had $25,000 a piece," while he retained only $10,000. Lawrence completed her report on April 15, 2022, and found the claim of financial exploitation to be inconclusive due to "insufficient evidence to make a clear finding as to the allegation."

In April 2022, Northstar was appointed as Bell's certified professional guardian. In May 2023, Northstar filed a complaint on Bell's behalf against the Department alleging common law and statutory negligence pursuant to RCW 74.34.063 and .067, gross negligence, outrage, and negligent infliction of emotional distress. The Department filed a motion for summary judgment seeking to dismiss all of Bell's claims. Bell agreed to dismiss his negligent infliction of emotional distress and common law negligence claims. Bell also filed a motion for partial summary judgment in his favor on the elements of duty and breach for his statutory negligence claim.

On March 4, 2024, the trial court denied Bell's motion and granted the Department's motion as to all claims except for that of outrage. Bell filed a motion seeking RAP 2.3(b)(4) certification and to stay the proceedings pending appeal. The trial court granted Bell's motion, and a commissioner of this court granted discretionary review.

DISCUSSION

Bell contends that the trial court erred when it granted the Department's motion for summary judgment and denied his motion for summary judgment because the AVAA establishes an implied private cause of action for negligence. Specifically, Bell asserts that RCW 74.34.063 and .067 create mandatory duties to investigate and provide protective services, respectively. Thus, he contends, although the statute does not include an express remedy for breach of these duties, there is an implied remedy under Bennett v. Hardy, 113 Wn.2d 912, 919-20, 784 P.2d 1258 (1990). The Department counters that the AVAA does not create an implied cause of action and, therefore, the trial court's dismissal of Bell's statutory negligence claim was proper.

On appeal, we review orders on summary judgment motions de novo. Keck v. Collins, 184 Wn.2d 358, 370, 357 P.3d 1080 (2015). The court must consider "the evidence and all reasonable inferences from the evidence in the light most favorable to the nonmoving party." Id. Summary judgment is proper when "there is no genuine issue as to any material fact" and the moving party is entitled to judgment as a matter of law. CR 56(c).

The court reviews de novo questions of law, such as whether a defendant owes a duty to the plaintiff. Hertog, ex rel. S.A.H. v. City of Seattle, 138 Wn.2d 265, 275, 979

7

P.2d 400 (1999). Statutory interpretation is also a question of law the court reviews de novo. <u>Kim v. Lakeside Adult Family Home</u>, 185 Wn.2d 532, 542, 374 P.3d 121 (2016).

The threshold determination in any negligence action is whether a duty of care is owed by the defendant to the plaintiff. <u>Taylor v. Stevens County</u>, 111 Wn.2d 159, 163, 759 P.2d 447 (1988). If the defendant owed the plaintiff no duty, the negligence action fails. <u>Folsom v. Burger King</u>, 135 Wn.2d 658, 671, 958 P.2d 301 (1988). A duty of care may exist by virtue of the common law or a statute. <u>Mathis v. Ammons</u>, 84 Wn. App. 411, 416-17, 928 P.2d 431 (1996). And as the Supreme Court has stated, because " 'we can . . . assume that the legislature would not enact a remedial statute granting rights to an identifiable class without enabling members of that class to enforce those rights,' " in such situations, courts will recognize an implied cause of action. <u>Bennett</u>, 113 Wn.2d at 919-20 (quoting <u>McNeal v. Allen</u>, 95 Wn.2d 265, 277, 621 P.2d 1285 (1980) (Brachtenbach, J., dissenting)).

To determine whether to imply a cause of action, a court "must resolve the following issues: first, whether the plaintiff is within the class for whose 'especial' benefit the statute was enacted; second, whether legislative intent, explicitly or implicitly, supports creating or denying a remedy; and third, whether implying a remedy is consistent with the underlying purpose of the legislation." <u>Bennett</u>, 113 Wn.2d at 920-21.

The parties do not dispute that Bell is within the class of persons that RCW 74.34.063 and .067 were designed to protect. A person is considered a vulnerable adult under the AVAA when they "lack the ability to perform or obtain those services necessary to maintain [their] well-being" or when they "have health problems that place

8

[them] in a dependent position." RCW 74.34.005(3), (4). Here, the APS reports explain that Bell is a vulnerable adult "due to a diagnosis of dementia" and a demonstrated "mental inability to care for himself independently." Thus, the first prong of the Bennett test weighs in favor of implying a cause of action.

However, the Department contends Bell cannot establish the second and third prongs of the Bennett test—legislative intent and consistency with the purpose.[5] We address each of those prongs in turn.

I.  Second Prong of *Bennett* Test: Legislative Intent

The question of whether the legislative intent "supports creating or denying a remedy is a question of statutory interpretation." Konicke v. Evergreen Emergency Servs., P.S., 16 Wn. App. 2d 131, 141, 480 P.3d 424 (2021). The purpose of statutory interpretation is to determine legislative intent in a manner as to give effect to that intent. Columbia Riverkeeper v. Port of Vancouver USA, 188 Wn.2d 80, 91, 392 P.3d 1025 (2017). A reviewing court ceases its inquiry if the plain language of the statute has a single interpretation. In re Adoption of T.A.W., 186 Wn.2d 828, 840, 383 P.3d 492 (2016). Plain meaning is understood within "the context of the entire act as well as any 'related statutes which disclose legislative intent about the provision in question.' " In re Dependency of Z.J.G., 196 Wn.2d 152, 163, 471 P.3d 853 (2020) (internal quotation marks omitted) (quoting Jametsky v. Olsen, 179 Wn.2d 756, 762, 317 P.3d 1003

---

[5] Bell contends that the Department is precluded from arguing that the third Bennett element is not satisfied—specifically, that implying a cause of action would contradict a purpose of the statute apart from the protection of vulnerable adults, to preserve the autonomy of vulnerable adults—because it did not raise the argument before the trial court. We exercise our discretion under RAP 2.5(a) to consider this argument.

(2014)). However, if the plain meaning is ambiguous, then a reviewing court may look at the legislative history to determine the legislative intent. Jametsky, 179 Wn.2d at 762.

With regard to the AVAA, in 1999, when the legislature consolidated provisions protecting vulnerable adults into chapter 74.34 RCW, it stated,

> The purpose of chapter 74.34 RCW is to provide the department [of social and health services] and law enforcement agencies with the authority to investigate complaints of abandonment, abuse, financial exploitation, or neglect of vulnerable adults and to provide protective services and legal remedies to protect these vulnerable adults.

LAWS OF 1999, ch. 176, § 1. Pointing to this statutory language, as well as RCW 74.34.063 and .067, Bell claims that the legislature recognized mandatory duties to investigate and to provide protective services and, though it did not articulate an explicit cause of action for breach of those duties, it implied a legal remedy. Thus, he suggests that when looking at the larger statutory scheme, it is evident that the legislature intended for vulnerable adults to have recourse to seek legal action when they were harmed by breach of these duties.

As a general rule, "the word 'shall' is presumptively imperative and operates to create a duty rather than conferring discretion." State v. Bartholomew, 104 Wn.2d 844, 848, 710 P.2d 196 (1985); see also Vehicle/Vessel LLC v. Whitman County, 122 Wn. App. 770, 780, 95 P.3d 394 (2004) (use of "shall" is mandatory when it operates to confer a right and establish a duty). By contrast, "words like 'may' are permissive and discretionary." State v. Stivason, 134 Wn. App. 648, 656, 142 P.3d 189 (2006); see also Konicke, 16 Wn. App. 2d at 142 (the word "may" in RCW 71.05.050(3) did not create a mandatory duty requiring health care providers to detain patients suspected of qualifying for an involuntary commitment and, therefore, the statute did not "provide a

corresponding right of action for not doing so"). While the Department acknowledges RCW 74.34.063 and .067 include some mandatory language, it contends that by relying only on this language, "Bell's approach divorces the language he relies upon from its true context," contrary to the statutory construction principles of interpreting the statute in its context and considering the statutory scheme as a whole. Instead, it argues, we must examine the structure of the statute and the context of the specific provisions on which Bell relies, RCW 74.34.063, relating to the Department's obligations to respond to reports of suspected abuse, and RCW 74.34.067, relating to investigations of suspected abuse. We agree with the Department.

First, the statute distinguishes between mandatory and permissive reports. RCW 74.34.035. Then, it addresses the content of such reports and describes the information that they "shall contain," "if known." RCW 74.34.040. The next section addresses "[i]mmunity from liability" resulting from reports or testimony by persons "participating in good faith in making a report under this chapter or testifying" about alleged abuse, neglect, abandonment, financial exploitation, or self-neglect of a vulnerable adult. RCW 74.34.050. This section specifies that "the making of permissive reports as allowed in this chapter does not create any duty to report and no civil liability shall attach for any failure to make a permissive report as allowed under this chapter." RCW 74.34.050(1). The statute then sets out penalties for failure to report by persons who are required to report and fail to do so, as well as for false reports made intentionally, maliciously, or in bad faith. RCW 74.34.053.

After these sections regarding reporting, the statute addresses the Department's responses to reports, beginning with RCW 74.34.063. The plain language of RCW

74.34.063 includes the "presumptively imperative" word "shall" in several places. RCW 74.34.063(1) provides that once the Department receives a report of suspected abuse or neglect, it "*shall* initiate a response to a report, no later than twenty-four hours after knowledge of the report." (Emphasis added). Further, the statute requires that "[w]hen the initial report or investigation by the department indicates that the alleged abandonment, abuse, financial exploitation, or neglect may be criminal, the department *shall* make an immediate report to the appropriate law enforcement agency." RCW 74.34.063(2) (emphasis added). If the investigation reveals that a crime may have been committed, "[t]he law enforcement agency of the department *shall* report the incident in writing to the proper county prosecutor or city attorney for appropriate action." RCW 74.34.063(3) (emphasis added). And "[t]he department *shall* notify the proper licensing authority concerning any report received under this chapter" that alleges that a person who has a state-regulated professional license, certification, or registration has abused, financially exploited, or neglected a vulnerable adult. RCW 74.34.063(6) (emphasis added). Thus, RCW 74.34.063 mandates that the Department take certain actions in response to certain kinds of reports. But it does not mandate that it investigate.

The next section in the statute, RCW 74.34.067—which specifically addresses investigations, interviews, case planning, and agreements with tribes—includes both mandatory and permissive language. This section begins, "Where appropriate, an investigation by the department *may* include a private interview with the vulnerable adult." RCW 74.34.067(1) (emphasis added). If the Department has reason to believe the vulnerable adult needs the protection of a guardian, "the department *may* bring a guardianship" or other protective proceedings. RCW 74.34.067(5) (emphasis added).

The statute also uses the word "may" to describe permissible actions during the Department's investigation, such as conducting case planning and consulting with mandatory reporters and tribal representatives, sharing information with the office of public guardianship, and photographing a vulnerable adult or their environment. RCW 74.35.067(3), (6), (9). And the Department "*may* enter into agreements with federally recognized tribes to investigate reports . . . and may notify tribal law enforcement or another tribal representative," at which point "the tribe may assume jurisdiction of the matter." RCW 74.34.067(8) (emphasis added).

In addition to the aforementioned permissive language, RCW 74.34.067 uses mandatory language regarding certain aspects of an investigation. While RCW 74.34.067(1) provides that the Department's investigation "*may* include a private interview with the vulnerable adult,"

> the department *shall* interview the complainant, unless anonymous, and *shall* use its best efforts to interview the vulnerable adult or adults harmed, and, consistent with the protection of the vulnerable adult *shall* interview facility staff, any available independent sources of relevant information, including if appropriate the family members of the vulnerable adult.

RCW 74.34.067(2) (emphasis added). Subsection (4) requires that "[t]he department *shall* prepare and keep on file a report of each investigation conducted by the department for a period of time in accordance with policies established by the department." RCW 74.34.067(4) (emphasis added).

Further, RCW 74.34.067 addresses the Department's authority after an investigation is completed. Subsection (7) requires that

> [w]hen the investigation is completed and the department determines that an incident of abandonment, abuse, financial exploitation, neglect, or self-neglect has occurred, the department *shall* inform the vulnerable adult of their right to refuse protective services, and ensure that, if necessary,

13

>appropriate protective services are provided to the vulnerable adult, with the consent of the vulnerable adult.

RCW 74.35.067(7) (emphasis added). The Department *may*—that is, it is authorized but is not required to—report the outcome to certain named agencies or programs, as well as state or local government authorities responsible for licensing or certification of such agencies or programs. RCW 74.34.068(1), (2) (emphasis added). Similarly, RCW 7.105.110(1) gives the Department discretionary authority to seek a protection order on behalf of a vulnerable adult, but only with the vulnerable adult's consent.

Thus, although RCW 74.34.067 imposes certain requirements once the Department embarks on an investigation, it contains no express mandate that the Department conduct an investigation in the first place. This subsection contrasts with RCW 74.34.035's requirement that mandated reporters "shall immediately report" to certain entities in certain specified circumstances. Moreover, even where RCW 74.34.067 uses the term "shall" with regard to the Department, these requirements are bounded by conditions—e.g., "the department shall interview the complainant, *unless anonymous*" and "shall use its *best efforts* to interview the vulnerable adult or adults harmed . . . including *if appropriate* the family members of the vulnerable adult." RCW 74.34.067(2) (emphasis added).

Nonetheless, Bell argues that RCW 74.34.050(2), which states that "[n]othing in this chapter shall be construed as superseding or abridging remedies provided in chapter 4.92 RCW," indicates that the legislature intended to allow the State to be "liable for breaches of mandatory duties set forth in chapter 74.34 RCW." Chapter 4.92

RCW pertains to actions and claims against the State. Bell reads this language in RCW 74.34.050(2) too broadly.

Thus far, our Supreme Court has recognized an implied cause of action under the AVAA only for vulnerable adults against mandatory reporters who fail to report. Kim, 185 Wn.2d 532. The court's analysis in Kim is instructive. First, the court held that under the first Bennett prong, the relevant portion of the AVAA, RCW 74.34.050, established a mandatory duty to report under certain circumstances. Id. at 544. Next, the Kim court noted that the AVAA provides immunity for those who in good faith make a report or testify about alleged abuse or neglect, RCW 74.34.050, and reasoned that "the provision of immunity from liability implies the possibility of civil liability." Id. at 545. The statute also specifies that "[t]he making of *permissive* reports . . . does not create any duty to report and no civil liability shall attach for any failure to make a *permissive* report as allowed under this chapter." Id. (quoting RCW 74.34.050(1) (emphasis added)). By contrast, the statute is silent as to any immunity for mandated reporters; thus, the Kim court reasoned, the legislature "implicitly recognized the existence of a cause of action against mandatory reporters who fail to report." Id. As to the third Bennett prong, the court held that an implied cause of action was consistent with the legislative intent to ensure the Department and law enforcement "investigate suspected abuse, and are able to provide protective services to abused vulnerable adults." Id. at 546. Finally, the court noted that even though RCW 74.34.200(1) explicitly includes a cause of action for actual abuse of vulnerable adults living in a facility or receiving home care from certain providers, this express liability provision did not preclude finding an implied cause of action against mandated reporters who breach a statutory duty to report. Id.

As explained in <u>Kim</u>, an express statutory remedy does not necessarily preclude finding an implied cause of action against others or for other harms. <u>Id.</u> The AVAA addresses liability both by providing limited express statutory remedies and by explicitly immunizing certain actions. RCW 74.34.200 provides a cause of action for damages against certain entities:

> In addition to other remedies available under the law, a vulnerable adult who has been subjected to abandonment, abuse, financial exploitation, or neglect either while residing in a facility or in the case of a person residing at home who receives care from a home health, hospice, or home care agency, or an individual provider, shall have a cause of action for damages on account of his or her injuries, pain and suffering, and loss of property sustained thereby. This action shall be available where the defendant is or was a corporation, trust, unincorporated association, partnership, administrator, employee, agent, officer, partner, or director of a facility, or of a home health, hospice, or home care agency licensed or required to be licensed under chapter 70.127 RCW, as now or subsequently designated, or an individual provider.

RCW 74.34.200(1). This section does not include the Department as a potential defendant. Where the legislature contemplates specific remedies against certain entities, it does not imply a cause of action against others. <u>Martinez v. Wash. State Univ.</u>, 33 Wn. App. 2d 431, 456, 562 P.3d 802 (2025) (statute did not name universities as potential defendants and thus intentionally declined to extend liability to them), <u>review granted</u>, 4 Wn.3d 1032, 570 P.3d 714 (2025).[6]

Regarding the relevance of immunity provisions, Bell quotes <u>Beggs v. Department of Social & Health Services</u>, for the proposition that a grant of immunity

---

[6] Bell submitted a statement of supplemental authority arguing that <u>Martinez</u> supports his position as to legislative intent. In <u>Martinez</u>, this court held that the legislative intent of former RCW 28B.10.901 (1993) did not support implying a cause of action against universities for failing to prevent hazing. 33 Wn. App. 2d at 457. Bell argues that <u>Martinez</u> is distinguishable because, unlike here, the relevant statute did not require universities to take "affirmative action" to prevent hazing and so did not indicate an intent to imply a remedy. <u>Id.</u> But the same is true here; the AVAA does not require the Department to investigate or provide protective services.

implies that civil liability can exist. 171 Wn.2d 69, 78, 247 P.3d 421 (2011). In Beggs, the court addressed whether RCW 26.44.030 implied a cause of action against a mandatory reporter who failed to report suspected child abuse or neglect. Id. at 77. The court reasoned that even though the relevant statute provided immunity from liability for people who cooperated in good faith with an investigation arising from a report, " '[this] grant of immunity clearly implies that civil liability can exist in the first place.' " Id. at 78 (quoting Doe v. Corp. of the President of the Church of Jesus Christ of Latter-Day Saints, 141 Wn. App. 407, 422-23, 167 P.3d 1193 (2007)). Because the statute imposed a duty on certain professionals to report child abuse, "[t]he statutory scheme supports an implied cause of action for a failure to fulfill that duty." Id. And in Kim, the court noted that the analysis in Beggs "guide[d] its analysis." Kim, 185 Wn.2d at 542.

However, what these cases tell us is that a grant of immunity to certain actors does not always suggest legislative intent to create a remedy against others. Rather, we must examine the specific actions to which the immunity applies, and whether those actions are the same as those alleged to give rise to liability in a particular case.

As discussed above, for the same reason that Kim is not dispositive of whether there is an implied cause of action against the Department, neither does Beggs support an implied cause of action in the circumstances of this case: both Beggs and Kim involved mandatory reporters. The AVAA provides immunity from liability to "[a] person participating in good faith in making a report under this chapter or testifying about alleged abuse, neglect, abandonment, financial exploitation, or self-neglect of a vulnerable adult in a judicial or administrative proceeding." RCW 74.34.050(1). Further, this provision explains, "The making of permissive reports as allowed in this chapter

17

does not create any duty to report and no civil liability shall attach for any failure to make a permissive report as allowed under this chapter." Id. But these immunity provisions relating to liability of mandatory and permissive reporters do not demonstrate legislative intent to create a cause of action against the Department.

The Department contends that because RCW 74.34.200(1) provides an explicit remedy for abuse or neglect but excludes the Department as an entity subject to suit, the legislature did not intend an implied cause of action against it for failure to protect vulnerable adults. The Department points to Carter v. Department of Social & Health Services, where the court held that RCW 26.44.031 did not support an implied cause of action against the Department for failure to destroy records of prior investigations of child abuse or neglect. 26 Wn. App. 2d 299, 313-14, 526 P.3d 874 (2023). There, one provision of the statute, RCW 26.44.031(5)(b), allowed the remedies of injunctive relief and a monetary penalty, but only for certain people and only for improper disclosures to certain entities, and another provision allowed "injunctive or other appropriate relief." RCW 26.44.031(5)(a). The Carter court held that because the legislature "specifically provided an enforcement mechanism in the form of injunctive relief," the legislature did not intend to create a remedy beyond that, including, e.g., for damages. 26 Wn. App. 2d at 314. The court distinguished Kim, noting that the AVAA created a right without an enforcement mechanism for that particular right. Clark, 26 Wn. App. 2d at 314.

We agree with the Department. The AVAA provides a cause of action for damages against specified entities, including "a corporation, trust, unincorporated association, partnership, administrator, employee, agent, officer, partner, or director of a facility, or of a home health, hospice, or home care agency licensed or required to be

licensed under chapter 70.127 RCW, as now or subsequently designated, or an individual provider." RCW 74.34.200. But the Department is not on this list.

The only immunity provision in the statute regarding the Department supports the conclusion that the legislature intended to limit the Department's liability. In 2007, the legislature amended RCW 74.34.150 and explicitly immunized the Department and the State from liability for "seeking or failing to seek" a civil protection order for a vulnerable adult. LAWS OF 2007, ch. 312, § 8.[7] Otherwise, as to the Department, the statute is silent as to immunity.

The fact that the statute immunizes some actions suggests that the legislature did intend a remedy if other actions—in particular, those that it mandates—are performed negligently. However, as the legislature authorized but did not mandate the Department to investigate or to provide protective services, those immunity provisions cannot be read to intend a cause of action against the Department.

We hold that the legislature did not impose a duty on the Department to investigate or provide protective services, nor did it intend a remedy for negligence for such non-mandatory actions. The second Bennett prong weighs against implying a cause of action against the Department as pleaded in this case.

II. Third Prong of *Bennett* Test: Consistency with the Purpose of the Statute

"[W]hen the legislature creates a duty, [the court] may provide a remedy for its breach, if the remedy is appropriate to further the purposes of the statute and is needed to assure its effectiveness." M.W. v. Dep't of Soc. & Health Servs., 149 Wn.2d 589, 596, 70 P.3d 954 (2003). Bell argues that an implied cause of action under RCW 74.34.063

_____

[7] This provision, former RCW 74.34.150 (2007), was recodified in 2021 as RCW 7.105.110(1). See LAWS OF 2021, ch. 215, § 15.

and .067 is consistent with the stated purposes of providing vulnerable adults with legal remedies and protective services, and ensuring autonomy of vulnerable adults because doing so would act as an enforcement mechanism to ensure the Department is accountable for its actions, citing Tyner v. State Department of Social & Health Services, Child Protective Services, 141 Wn.2d 68, 81, 1 P.3d 1148 (2000).

In Tyner, the court held that pursuant to former RCW 26.44.050 (1987),[8] the Department owed a duty of care to the parent of a child suspected of abuse when investigating claims of child abuse. 141 Wn.2d at 81. Therefore, the court reasoned, an implied remedy was available to guarantee " '[a]ccountability through tort liabilities,' " to assure " 'a certain standard of performance from government entities.' " Id. at 80 (quoting Bender v. City of Seattle, 99 Wn.2d 582, 590, 664 P.2d 492 (1983)). The statute in Tyner, former RCW 26.44.050 (1987), contains clear language mandating a duty to investigate child abuse allegations:

> Upon the receipt of a report concerning the possible occurrence of abuse or neglect, it *shall be the duty* of the law enforcement agency or the department of social and health services to investigate and provide the protective services section with a report in accordance with the provision of chapter 74.13 RCW, and where necessary to refer such report to the court.

141 Wn.2d at 77 (emphasis added). As the Tyner court reasoned, there would never be a situation "in which the State owes a duty to both initiate and not initiate" an action. 141 Wn.2d at 81.

Here, we need not search far to unearth the AVAA's stated purpose,[9] as the legislation included a clear statement: "The purpose of chapter 74.34 RCW is to provide

---

[8] LAWS OF 1987, ch. 450, § 7.

[9] The Department focuses on the legislature's intent to preserve the autonomy of vulnerable adults, noting that the legislature made the provision of protective services discretionary and subject to a

20

the department and law enforcement agencies *with the authority* to investigate complaints of abandonment, abuse, financial exploitation, or neglect of vulnerable adults." See Laws of 1999, ch. 176, § 1 (emphasis added). This language contrasts with the language in the child abuse and protection statute discussed in Tyner: " 'it *shall be the duty* of the law enforcement agency or the department of social and health services to investigate and provide the protective services section with a report.' " 141 Wn.2d at 77 (quoting former RCW 26.44.050 (1987)). In the AVAA, the legislature was clear in granting the Department authority to investigate complaints but not requiring it to do so.

Therefore, after examining the third Bennett prong, we conclude that implying a cause of action under RCW 74.34.063 and .067 for negligent investigation would be inconsistent with the stated legislative purpose of the AVAA.

## CONCLUSION

Applying the Bennett test, we hold that there is no implied cause of action for negligent investigation of referrals of suspected abuse under the AVAA. Accordingly, the trial court did not err in dismissing Bell's claims. We affirm.

_Chung, J._

---

vulnerable adult's right to refuse services. See RCW 74.34.067(2). Thus, the Department contends that implying a cause of action for failure to provide services would contravene the legislative purpose and the right of vulnerable adults to refuse services. In support, the Department points to Turner v. Department of Social & Health Services, where the court concluded that implying a cause of action against the Department for its case management would be contrary to its "statutory goal of allowing vulnerable adults the choice to live in independent settings," when the plaintiff voluntarily chose to live independently. 198 Wn.2d 273, 300, 493 P.3d 117 (2021). We need not reach this argument regarding a statutory purpose with regard to vulnerable adults' autonomy when the AVAA included a clear statement of purpose. See Laws of 1999, ch. 176, § 1.

WE CONCUR: